Petitioners McFadden Engineering, Inc., A. Frank McFadden, SJL, Inc., Michael B. Tew, and North American Specialty Insurance Company (hereinafter collectively referred to as "the petitioners") petition for a writ of mandamus directing the trial court to vacate its order refusing to allow the petitioners to conduct, or adequate time in which to conduct, certain discovery. We grant the petitions in part and deny the petitions in part.
 I. Facts[1]
This case began on May 6, 1996, when the Town of Millry, Alabama, sued the petitioners asserting claims of fraud, breach of warranty, negligence, and wantonness stemming from the petitioners' design and construction of Millry's expansion of its existing sewer system ("the expansion system"). The expansion system, which was designed by McFadden Engineering in 1993 and constructed and installed by SJL, Inc., during the years *Page 998 
1993-1994, included installation of, among other things, main sewer lines, service lines, and individual septic tanks at certain Millry households. However, the connection of those septic tanks to the individual households was left to others to complete; SJL, Inc., was not responsible for connecting the tanks to the households. Those connections were completed by August 1994; subsequently, certain problems developed, including stoppages, overflows, and venting of sewer gases.
On January 11, 2000, three and a half years after litigation began, 29 Millry residents filed a motion to intervene as individual plaintiffs. The trial court granted that motion on February 14, 2000. On April 17, 2000, 87 additional residents filed a similar motion to intervene. The last motion to intervene was filed by three Millry homeowners on May 22, 2000. The trial court granted those motions on June 9, 2000.
In sum, after three and a half years of litigation, and over the petitioners' objections, the trial court added 119 individual plaintiffs to the case (hereinafter "the intervenor plaintiffs"). Along with the new plaintiffs came new claims. In their intervenors' complaints, the intervenor plaintiffs adopted some of Millry's claims against the petitioners, but also added claims alleging nuisance, trespass, and the tort of outrage. Not surprisingly, the intervenor plaintiffs' claims alleged various individualized damages not only to their properties but also to their mental and emotional states.
Beginning in March 2000, and continuing through late November 2000, the petitioners sent various interrogatories and requests for production to each of the intervenor plaintiffs, in an attempt to assess, among other things: (1) the specific damages each intervenor plaintiff was claiming, (2) any problems that each intervenor plaintiff had had with the plumbing or septic system before the expansion system was installed; (3) any repairs that each intervenor plaintiff had made to his or her individual plumbing or septic system, and (4) the identification of any expert witnesses who would testify for the intervenor plaintiffs. However, the intervenor plaintiffs' responses arrived in a less-than-expedient fashion, to say the least.
For example, on September 1, 2000, after no responses had been received to the interrogatories and requests for production sent by McFadden Engineering, Inc., and A. Frank McFadden (hereinafter collectively referred to as "the McFadden defendants") on March 13, 2000, the McFadden defendants filed a motion to compel, which the trial court granted on September 12.[2] Subsequently, on or about October 2, 2000, some of the intervenor plaintiffs submitted responses; however, *Page 999 
these responses were incomplete and unresponsive, and they were not signed or notarized. Based on the intervenor plaintiffs' failure and/or refusal to "fully, completely, and individually" respond to discovery (as they had been ordered to do by the trial court), the McFadden defendants filed a second motion to compel on November 7, 2000, which was granted on the same day.[3]
Approximately one month later, on December 6, 2000, after having received nothing in response to the trial court's order granting thesecond motion to compel, the McFadden defendants filed a motion asking the trial court to dismiss the intervenors' complaint and/or to sanction the intervenor plaintiffs for their failure to comply with the trial court's orders compelling discovery responses. Finally, beginning on December 21, 2000, and continuing through May 4, 2001, the intervenor plaintiffs gradually submitted responses to the petitioners. While some of the responses were still somewhat incomplete, they were apparently sufficient to provide a foundation based on which the petitioners could prepare to take the depositions of each intervenor plaintiff. Accordingly, the depositions of 87 of the intervenor plaintiffs[4] were taken between April 2001 and December 2001.[5] Additionally, in November and December 2001, the plaintiffs took the depositions of the petitioners and their experts.
The depositions of the intervenor plaintiffs revealed particular facts surrounding their individualized allegations, which were, not surprisingly, not sufficiently known until those depositions were taken. For example, as to their claims of physical injury, the depositions revealed which doctors had treated them, and also revealed that some of the intervenor plaintiffs were claiming that they have been caused to suffer specific maladies such as headaches and/or nausea.[6]
Similarly, with regard to *Page 1000 
their claims of damage to personal and real properties, the depositions revealed such specifics as: (1) what damage had been incurred (such as damage to bathrooms, kitchen floors, and yards), (2) when the damage began to occur, and (3) the details of the party's individual plumbing and electrical systems. Also, the deposed intervenor plaintiffs testified that they did not know how much, if any, the alleged wrongful acts had caused the value of their property to depreciate, and that no appraisals of their residences had been performed.
On December 14, 2001, the plaintiffs filed supplemental responses to interrogatories and requests for production, identifying 22 categories of individuals who may have knowledge of the facts surrounding the plaintiffs' claims. These categories included several individuals who had not yet been deposed. Also identified for the first time in the supplemental responses was an expert witness, Silas Williams, who was to testify as to the values of the intervenor plaintiffs' properties and the alleged diminution of those values. Accordingly, beginning on the same day and continuing through December 28, 2001, the petitioners began receiving Williams's appraisal reports of the intervenor plaintiffs' residences.[7]
To counter this new information, the petitioners retained their own expert property appraisers to examine the plaintiffs' properties and prepare their own appraisal reports. Additionally, having just completed taking the depositions of most of the intervenor plaintiffs as described above, the petitioners also sought to inspect the homes of each intervenor plaintiff in order to investigate the specific damage claims made by each intervenor plaintiff during deposition and the possible causes for that damage and to examine each intervenor plaintiff's particular electrical and plumbing connection to the expansion system. However, in a letter dated January 11, 2002, counsel for the intervenor plaintiffs refused to give permission to the petitioners to perform those inspections, stating that the inspections were not necessary and that the petitioners had waited too close to the date of trial — which had been set for February 11, 2002[8] — to seek the inspections.
After intervenor plaintiffs' counsel denied permission for the inspections, the petitioners on January 14, 2002, jointly filed a "Motion for Immediate Entry Upon Land for Inspection."[9] That motion stated:
 "The intervenor plaintiffs are all residents of the Town of Millry who complain about the functioning of the expanded sewer system in Millry. When the expansion was installed in 1994, a sewage holding tank was placed in the ground adjacent to each residence or other structure to be serviced by the system. Most tanks also had an electric pump installed in them.
 "Although the tanks and the main lines were installed by SJL, Inc., the electrical and plumbing connections between *Page 1001 
 each resident's sewage tank and each resident's home were [not] the responsibility of SJL, Inc., and were installed by other contractors or by the individual residents themselves. It is, therefore, the [petitioners'] intent to inspect each individual residence to determine whether the condition of the electrical service and plumbing in and around the intervenor plaintiffs' property may be contributing to any problems of which the intervenor plaintiffs are complaining.
 "[Petitioners] will be accompanied by Owen S. Posey, P.E., an expert who has been retained by [the petitioners] for these inspections. [The petitioners] will need to enter the property of each intervenor plaintiff to inspect the tank of the property, to inspect the pump in each tank, if there is a pump, and to inspect the plumbing from the house to the tank. [The petitioners] will also need to enter the residence or building to inspect the condition of the household plumbing. [The petitioners] further intend to make photographic documentation of their inspections.
 "The trial of this matter is set for February 11, 2002; therefore, it is necessary that [the petitioners] be given immediate access to the property of the intervenor plaintiffs in order to have any chance of completing the inspections prior to trial."
The petitioners' motion further summarized their need for the inspections as follows:
 "4. Despite the plaintiffs' counsel's contentions otherwise, these [petitioners] have not been given an adequate opportunity to inspect the system and the individual residences.
 "5. First, no inspection of the system or the homes the subject of this action has been conducted since the intervenor plaintiffs were made a party to this action in January, 2001. The last inspection of the system would have been made sometime in 1998. Those prior inspections did not primarily involve the plumbing and electrical system of each residence, rather the inspections focused on the sewer system installed by SJL (including the tank on the properties and the service lines from the main line to the tanks.) A few homes were entered during these inspections to ascertain the residents' problems but the vast majority of the intervenor plaintiffs' homes were never inspected.
 "6. Moreover, even though inspections have been conducted in the past, at best, no more than half of the intervenor plaintiffs' properties and only a few homes themselves, have been inspected by the [petitioners]. In fact, these [petitioners] were not even made aware of the [sic] many of the alleged complaints of these intervenor plaintiffs until the Motion to Intervene was filed.
 "7. The intervenor plaintiffs are now claiming damages for injury to various aspects of their homes, including damage to bathroom and kitchen floors and damage to various yards. These aspects of the homes would not have been inspected previously as they were not an issue in this action which previously only involved the Town of Millry.
 "8. Between April and December 14, 2001, the [petitioners] have been taking the depositions of the intervenor plaintiffs.
 "9. Until these [petitioners] were aware of the specific problems of which each intervenor plaintiff complained through these depositions, an inspection of these homes prior to December 14, 2001, would have been futile.
 "10. Over the past month, the [petitioners] have been receiving various appraisal *Page 1002 
 reports of the intervenor plaintiffs' homes conducted by Silas Williams. Representative copies of those appraisals are attached hereto as Exhibits `B' and `C.' These appraisals contain various statements of fact regarding these properties and statements regarding the condition of these homes. These [petitioners] should be entitled to inspect these homes to verify the condition of the homes and to verify that these statements of fact are correct.
 "11. Moreover, the McFadden defendants have retained an appraisal expert who is currently reviewing the appraisals produced by plaintiffs' counsel. As part of his rendering of his opinions, it would, of course, be necessary to inspect at least some of the intervenor plaintiffs' properties.
 "12. As set out in these [petitioners'] Motion to Compel and Request for Mediation, the [petitioners] have been diligent in the conducting of discovery with almost 100 depositions having been taken in the last eight months."
Essentially, therefore, the petitioners' motion requested: (1) permission to inspect the intervenor plaintiffs' electrical and plumbing connections and the claimed damaged areas of their residences; (2) permission to inspect the intervenor plaintiffs' properties in order to perform appraisals, and (3) adequate time to perform the various inspections and to complete other still outstanding discovery.[10]
On January 16, following a hearing on the motion, the trial court ruled as follows. The court denied the petitioners' request to enter and inspect the intervenor plaintiffs' properties as to all purposes except appraisal purposes. However, the court also denied the petitioners' motions for continuances, meaning that the petitioners would have less than a month to complete the appraisals — or any other discovery matters — if the petitioners wanted to have them available before trial, which was set for February 11. The petitioners now seek a writ of mandamus directing the trial court to vacate its January 16, 2002, order and to allow all of the requested inspections as well as additional time to complete these inspections and the remaining discovery.
 II. Standard of Review
We recently summarized our standards regarding review of a trial court's discovery order:
 "Discovery requests are governed by Rule 26, Ala.R.Civ.P. However, `[d]iscovery matters are within the trial court's sound discretion, and its ruling on those matters will not be reversed absent a showing of abuse of discretion and substantial harm to the appellant.' Wolff v. Colonial Bank, 612 So.2d 1146, 1146 (Ala. 1992) (citations omitted); see also Ex parte Hicks, 727 So.2d 23, 33 (Maddox, J., dissenting). The trial court's discretion is not unlimited:
 "`[T]he standard this Court will apply in reviewing [the trial judge's] actions on a petition for a writ of mandamus is whether there has been a clear showing that the trial court abused its discretion. Thus, a writ of mandamus directing the trial judge to set aside his ruling on a discovery matter will issue only where it is clear that the trial judge has abused his discretion.'
"Ex parte Clarke, 582 So.2d 1064, 1067 (Ala. 1991). *Page 1003 
 "A petition for the writ of mandamus is the proper method for presenting the question whether a trial judge has abused his discretion in ordering discovery. Ex parte Allstate Ins. Co., 401 So.2d 749, 751 (Ala. 1981). The writ of mandamus is a drastic and extraordinary writ that will be issued only when there is: (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court. Ex parte Horton, 711 So.2d 979, 983 (Ala. 1998) (citing Ex parte United Serv. Stations, Inc., 628 So.2d 501
(Ala. 1993)); Ex parte Alfab, Inc., 586 So.2d 889
(Ala. 1991) (citing Martin v. Loeb Co., 349 So.2d 9
(Ala. 1977)). Thus, the writ of mandamus will not issue to direct the trial court to change its discovery order unless this Court determines, `based on all the facts that were before the trial court, that the trial court clearly abused its discretion.' Ex parte Horton, 711 So.2d at 983."
Ex parte Nat'l Sec. Ins. Co., 773 So.2d 461, 464 (Ala. 2000). Therefore, the issue in this case is whether the trial court clearly abused its discretion in refusing to allow the petitioners to conduct, or adequate time to conduct, the requested discovery described above.
With respect to the trial court's denial of the petitioners' request to inspect the intervenor plaintiffs' residences for purposes of inspecting the plumbing and electrical connections and verifying the plaintiffs' claims of damage, we hold that the trial court clearly abused its discretion, and we issue the writ. As to the trial court's denial of additional time within which to complete discovery, we hold that that issue is moot and, as to the petitioners' request for additional time, we deny the petitions.
 III. Analysis
The discretion enjoyed by a trial court regarding discovery matters is certainly broad, but the boundaries of that discretion are necessarily governed by the various burdens placed on the parties by one another and by the orders of the trial court itself. Accordingly, a trial court's discretion with regard to a defendant's discovery request cannot be examined in a vacuum; rather, it must be viewed in the context of the plaintiff's claims, including the number, specificity, and timing of those claims. Without some indication of contemptuous behavior or lack of diligence by a defendant, a trial court virtually never has the discretion to bar a defendant from discovery relating to specific, material facts a plaintiff has alleged against a defendant. See Ex parte Dumas, 778 So.2d 798, 801
(Ala. 2000) (noting that when a plaintiff puts a particular fact in issue, the defendant's right to discovery is extremely broad and that "`[a] trial judge, who has broad discretion in this area, should nevertheless incline toward permitting the broadest discovery . . . .'" (quoting Ex parte AMI West AlabamaGen. Hosp., 582 So.2d 484, 486 (Ala. 1991)).
 The petitioners' request to inspect plumbing and electrical connections to the expansion system and to examine alleged physical damage.
The plaintiffs contend that the petitioners could and should have sought to inspect the intervenor plaintiffs' plumbing and electrical connections to the expansion system and to examine the alleged physical damage to the intervenor plaintiffs' residences much earlier than January 2002. For example, the plaintiffs state that the petitioners "were aware of the complaints concerning problems with the sanitary sewer system from the time the last home was connected to the system in August of *Page 1004 
1994," and that "[t]he Petitioners had almost unlimited and unfettered access to the individual plaintiffs' residences to inspect the sewer line and connection to the individual residences from 1994 through approximately June of 1998. . . ."[11] (Plaintiffs' brief at 58). Apparently, the plaintiffs' argument is that the petitioners should have anticipated the specific damage the intervenor plaintiffs would assert and should have inspected the residences before taking the depositions of those plaintiffs.
However, this argument ignores both the nature of the adversarial process and the realities of the discovery process. In our judicial system, the burden of proof is always on the party bringing the allegations. In a civil case, because the plaintiff brings the allegations and therefore carries the burden of proof, the defendant need not "guess" or "speculate" as to what evidence of damage the defendant should seek to counter. Instead, the defendant's course of discovery "follows" the plaintiff's evidence of damage, which is identified through the discovery process.
Obviously, to say that the petitioners were aware of general "problems" is not to say that they were aware of the specific damage the petitioners would be charged with having caused. Given the fact that pleadings are generally stated in very broad terms, see Ala.R.Civ.P. 8(a) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"), the very purpose of discovery (especially the taking of depositions) is to give the parties an opportunity to clearly define the damage being asserted, which provides the party being charged with wrongdoing fair notice of the specific "wrongs" he must then be prepared to counter at or before trial:
 "`Generally speaking, the purpose of modern discovery is to assist the administration of justice, to aid a party in preparing and presenting his case or his defense, to advance the function of a trial in ascertaining truth, and to accelerate the disposition of suits. Beyond this, the rules for discovery are designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments be rested upon the real merits of cases and not upon the skill and maneuvering of counsel.' 23 Am.Jur.2d, Depositions and Discovery, § 155 (1965). Stated otherwise, the rules seek to `make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.' United States v. Procter and Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)."
Ex parte Dorsey Trailers, Inc., 397 So.2d 98, 103 (Ala. 1981) (also stating that "[a] defendant is entitled to the factual basis of the plaintiff's claim and all facts going to prove or disprove defendant's defense," 397 So.2d at 104); see also Cone Builders, Inc. v. Kulesus,585 So.2d 1284, 1289 (Ala. 1991) (stating that "[u]ndeniably, the purpose of the discovery process is to avoid unfair surprise at the trial").
It is true that, as the plaintiffs note, the petitioners had performed some *Page 1005 
"inspections" of some of the intervenor plaintiffs' residences before 1998. However, there are several reasons that this fact does not bolster the plaintiffs' arguments. First, those inspections, made at Millry's request, were made before any of the residents whose homes were inspected became plaintiffs. Therefore, the petitioners had no chance, before the inspections, to identify all of the damage that would need to be looked for and verified. Also, because those inspections were completed at least two years before any of the Millry residents intervened, further inspections would still be needed to determine what damage the residents were claiming at the time they became plaintiffs.
Second, the inspections were generally limited, focusing mainly on the parts, such as the holding tanks and the service lines from the tanks to the main sewer lines, associated with the work actually performed by the petitioners. The inspections did not focus on the connections from the tanks to the homes, any defects in the plumbing or electrical system in the homes, or any alleged damage to the homes, although problems with those items were noted where observed.
Finally, the limited inspections were performed on less than 30 Millry residences whose owners had made complaints. The vast majority of residences owned by those who later became intervenor plaintiffs were not inspected.
It is undisputed that the evidence sought by the petitioners through the inspections is extremely relevant, because those inspections concern precisely what the plaintiffs have alleged and must prove: causation (which requires an examination of the electrical and plumbing connections of each residence for possible causes) and damage (which requires an examination of the alleged damage to each residence). Understood properly, this evidence is similar to the evidence sought by a defendant who is seeking evidence relating to both possible alternative causes and alleged damage in a personal-injury case, in which the defendant is entitled to extremely broad discovery. See Dumas, supra, 778 So.2d at 801 ("This Court has held that when a party files a lawsuit that makes an issue of his physical condition, he waives his privacy rights in favor of the public's interest in full disclosure." (citing Mull v. String,448 So.2d 952, 954 (Ala. 1984)); Ex parte Thomas, 628 So.2d 483 (Ala. 1993). The plaintiffs do not contend that the information is not relevant; rather, they appear to rely solely on the trial court's ability to refuse discovery requests of a party who has not been diligent in conducting discovery. While that power surely rests in the trial court, any exercise of that power to bar the petitioners from performing the inspections now sought was clearly an abuse of discretion in this case.
The fact that the petitioners did not, until January 2002, seek permission to enter onto the intervenor plaintiffs' property to perform the inspections they now seek is not at all surprising or unreasonable, given the course of discovery in this case. After three and one-half years of litigation with only one named plaintiff — the Town of Millry — the trial court in early-to mid-2000 radically changed the nature of this case by allowing over 100 individual plaintiffs to intervene, each claiming individualized damages. The petitioners immediately sought written discovery responses (which typically provide the foundation for depositions) regarding these new plaintiffs, but, as described above, those responses were seriously delayed by the plaintiffs' failure or refusal to respond appropriately, even after they were ordered to do so by the trial court.
When the responses (still somewhat incomplete) were finally all received in April *Page 1006 
2001, the deposition process began, and it was not completed until December 2001. Even then, the plaintiffs failed to produce five of the intervenor plaintiffs noticed for deposition, and, as the trial court itself noted, the plaintiffs have not yet given a valid reason for that failure.
When viewed as a whole, nothing in the discovery process indicates that the petitioners were not diligent in pursuing discovery. On the contrary, it appears that lack of diligence was mainly a characteristic of the plaintiffs, who were, for the most part, nonresponsive. Because, as stated above, the petitioners were entitled to follow the plaintiffs' "lead" in determining what theories of causation to disprove and what alleged damage to examine, the petitioners' actions in seeking to depose the numerous intervenor plaintiffs before examining their residences were more than reasonable and do not demonstrate a lack of diligence.
Because there was no contemptuous behavior or lack of diligence on the part of the petitioners, the trial court clearly abused its discretion in denying them the ability to inspect the intervenor plaintiffs' residences in order to discover this clearly and directly relevant information. Therefore, we issue the writ as to this discovery aspect. B. Thepetitioners' request for time to complete appraisals and other outstandingdiscovery.
The plaintiffs contend that the issue whether to allow the petitioners additional time to complete their appraisals of the intervenor plaintiffs' properties is now moot as a result of this Court's stay of the proceedings below while the petitions for writ of mandamus were pending. The plaintiffs assert that the next applicable civil jury term is not until August 2002, and that an August trial date would provide the petitioners with sufficient time to complete the appraisals.
The petitioners concede that the appraisals and other outstanding discovery could be completed by August 2002; in fact, the petitioners indicate that the appraisals can be completed in approximately two months. Therefore, based on the representations of the parties, we find that this issue is now moot.
 IV. Conclusion
For the reasons stated above, we grant the petitions in part and issue the writ directing the trial court to grant the petitioners' request to inspect the intervenor plaintiffs' residences made in their "Motion for Immediate Entry Upon Land for Inspection." We deny the petitions as moot as to the petitioners' requests for additional time within which to complete appraisals and other discovery.
PETITIONS GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
See, Lyons, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.
Moore, C.J., dissents.
[1] We note at the outset that, as in any mandamus review of a trial court's ruling on a discovery request, our determination of the propriety of the ruling depends greatly on the factual context from which the ruling arose. Unfortunately, in their responsive brief, the plaintiffs provided this Court with approximately 46 pages of facts, almost none of which are relevant to the issue before this Court. Instead of providing this Court with facts responsive to the petitioners' brief and related to the discovery process in this case, the plaintiffs apparently, as the petitioners note in their reply brief, merely copied their factual statement from their motion in opposition to a summary judgment filed in the trial court; that motion is directed at the merits of their particular claims rather than the history of the discovery process. Because the plaintiffs' statement of facts presents few, if any, legitimate conflicts with the description of the discovery process as stated by the petitioners and properly supported by the petitioners' materials, we must assume that the petitioners' facts are substantially correct.
[2] Counsel for the McFadden defendants did not immediately seek a motion to compel when the intervenor plaintiffs did not respond. Instead, on July 12, 2000, they attempted to resolve the intervenor plaintiffs' failure to respond through correspondence with the intervenor plaintiffs' lawyer, Joseph C. McCorquodale III; the letter to Mr. McCorquodale stated:
"Dear Mac:
 "We served Interrogatories and Requests for Production on the intervenor plaintiffs on March 13, 2000. The intervenor plaintiffs' responses to this discovery are now past due. Please furnish me with your clients' responses within fifteen (15) days of the date of this letter; otherwise I will have to file a motion to compel.
"Sincerely,
"/s/Winston R. Grow
"WINSTON R. GROW
"For the Firm"
Apparently, the intervenor plaintiffs ignored this request. However, even after this letter was sent, counsel for the McFadden defendants waited until September 1, 2000 — more than 50 days later — to file their motion to compel.
[3] The McFadden defendants' second motion to compel also stated that "[t]hese defendants further move this Court for an Order requiring the intervenor plaintiffs to show cause why they failed to comply with this Court's Order requiring them to respond to said discovery, and upon a failure to show cause, these defendants move this Court for an Order holding the intervenor plaintiffs in contempt." This request appears to have been granted also, because the trial court granted the second motion to compel in its entirety by simply writing "Granted" on the motion.
[4] Even though they had been sent deposition notices, five of the intervenor plaintiffs were never produced for deposition. Instead, counsel for the intervenor plaintiffs produced "representatives" of those plaintiffs for deposition, claiming that the five noticed intervenor plaintiffs were too sick or disabled to testify. However, no evidentiary showing was made of these plaintiffs' alleged disabilities.
This issue was raised again at a hearing on January 31, 2002 (at which the petitioners filed yet another motion to dismiss and/or for sanctions based on the plaintiffs' failure to produce information previously requested), and counsel for the intervenor plaintiffs stated that while he would not call as witnesses the five plaintiffs who had not yet been deposed, he would not dismiss them as plaintiffs and he intended to advance their claims against the petitioners. When the trial court stated that those plaintiffs should be dismissed unless there was an evidentiary showing as to why they could not be deposed, counsel agreed to make such a showing. However, no such evidentiary showing was made.
[5] Interestingly, in late 1999, the petitioners had apparently sought to take the depositions of the Millry residents who were connected to the expansion system (before the residents intervened in this action), but were asked by counsel for the intervenors to postpone the depositions, because the residents would be intervening in the action.
[6] This information led the petitioners to issue subpoenas to various health-care providers for medical records and to notice the deposition of a physician who had treated many of the intervenor plaintiffs. According to the petitioners, medical discovery has not yet been completed.
[7] Apparently, the plaintiffs had retained Williams before a motion-docket call held on November 14, 2001, because some of his appraisal reports were dated well before that date.
[8] The trial date had been set at the November 14, 2001, docket call. At that time, the petitioners objected to the February 11, 2002, trial date, asserting that they did not believe discovery could be completed by then, but that they would make an effort to complete it.
[9] The motion was actually filed by defendants SJL, Inc., and Michael Tew, but the McFadden defendants moved to join in the motion the next day, asserting additional reasons the motion should be granted.
[10] The petitioners' requests for additional time actually came in the form of motions for continuance filed on January 3, 2002. The trial court ruled on those motions on January 16, 2002, when it ruled on the petitioners' January 14, 2002, motion seeking permission to inspect the intervenor plaintiffs' properties.
[11] Because these assertions (like many in the plaintiffs' argument section of their brief to this Court) are made without citation to the record to provide support and context, it is difficult to determine precisely what the plaintiffs are referring to by the phrase "almost unlimited and unfettered access." As discussed below, however, even if this assertion were true, the fact that the petitioners had such access before 1998 would not now support the plaintiffs' arguments.