On Application for Rehearing
This court's opinion of January 16, 2004, is withdrawn, and the following is substituted therefor.
Fort James Operating Company ("Fort James") petitions this court for a writ of mandamus in this workers' compensation case. The plaintiff in this case, Jimmy Roberts, has alleged injuries to both his right and left knees as a result of various accidents occurring during 1997 in the course of his employment with Fort James, as well as "cumulative trauma" to both knees.
On August 5, 1999, Roberts filed a verified and notarized complaint alleging that he had injured his right knee in January 1997, when he slipped on a patch of ice and fell. He also alleged that on some unspecified date he had injured his left knee when he "had to make a three-foot step down." The complaint further alleged that both knees were injured as the result of cumulative on-the-job trauma caused by climbing, kneeling, squatting, twisting, and falling. Finally, the complaint included an allegation that Roberts had again injured his left knee in October 1997 when he "slipped off of a piece of pipe."
The materials submitted by the parties to this court tend to indicate the following: In June 1997, Roberts underwent an operation on his right knee; Roberts testified in his deposition that the operation did not improve the condition of that knee. Roberts's physician, Dr. Gus A. Rush III, subsequently assigned an 8% permanent-impairment rating to Roberts's right leg as a result of his injuries.
In December 1997, a second physician, Dr. William Standeffer, performed an operation on Roberts's left knee. Thereafter, Standeffer assigned a 10% permanent-impairment rating to Roberts's left leg. *Page 838 
Because of continued pain in Roberts's right knee, Dr. Standeffer performed another operation on the right knee in August 1998. According to Roberts's deposition testimony, this second operation "fixed" his right knee. Nonetheless, Dr. Standeffer subsequently assigned a 17% permanent-impairment rating to Roberts's right leg.
Roberts returned to full-duty work at Fort James with no work restrictions in October 1998, but he continued to complain of knee pain. Dr. Standeffer subsequently diagnosed Roberts with arthritis in his knees, limited Roberts to 40 hours of work per week, and eventually concluded that Roberts could not continue to work as a pipe fitter or heavy laborer. Roberts quit work in May 1999.
Fort James treated Roberts's injuries as scheduled injuries under § 25-5-57(a), Ala. Code 1975. Section 25-5-57(a)(3)a., Ala. Code 1975, provides for 200 weeks of benefits for the loss of a leg. Section 25-5-57(a)(3)d., Ala. Code 1975, provides:
 "Loss of Use of Member. The permanent and total loss of the use of a member shall be considered as equivalent to the loss of that member, but in such cases the compensation specified in the schedule for such injury shall be in lieu of all other compensation, except as otherwise provided herein. For permanent disability due to injury to a member resulting in less than total loss of use of the member not otherwise compensated in this schedule, compensation shall be paid at the prescribed rate during that part of the time specified in the schedule for the total loss or total loss of use of the respective member which the extent of the injury to the member bears to its total loss."
Fort James reasoned that the 10% permanent-impairment rating that Dr. Standeffer assigned to Roberts's left leg entitled Roberts to 20 weeks of benefits, and that the 17% permanent-impairment rating that Dr. Standeffer assigned to Roberts's right leg entitled Roberts to 34 weeks of benefits. Accordingly, Fort James paid Roberts 56 weeks of permanent partial disability benefits: 20 weeks for the partial loss of use of the left leg and 36 weeks (rather than the 34 weeks calculated) for the partial loss of use of the right leg.
In July 1999, Roberts filed a claim for disability benefits under his pension plan, which is wholly funded by Fort James. Since November 1, 1999, the Fort James pension plan has paid Roberts $1,363 per month in disability-retirement benefits; those payments will continue for the remainder of his life.
As noted above, Roberts filed his complaint on August 5, 1999. Over the course of the next 18 months after the complaint was filed, the parties conducted discovery as to the injuries alleged in that complaint, namely, the alleged injuries to Roberts's knees. Among other things, Fort James propounded a "first set of interrogatories"; in answers to those interrogatories dated May 19, 2000, Roberts stated that he had suffered knee injuries before the injuries for which he made claims in this case but that he had no other permanent mental or physical conditions that affected his ability to function.
In a deposition taken on March 26, 2001, Roberts testified that he had some muscle pain in his back and that in December 2000 he had fallen and injured his shoulder while walking in the woods:
 "Q: Besides the injuries to your knees, do you have any — you were telling me a minute ago about some kidney stones that you had. Do you have any other problems, physical problems?
 "A: The only thing I have is my back muscles. I take muscle relaxers for *Page 839 
that. I assume, it's caused by, you know, the way I walk or move around. I have trouble with my back every once in a while.
 "Q: I saw recently your attorney sent me a record indicating that you had some problem with your shoulder.
"A: Yes.
"Q: Tell me about that.
 "A: I slipped and fell. I don't know what to blame it on, but I slipped. My knees are not as good as they used to be, and I slipped and I fell. And I caught on this arm and tore up my shoulder.
"Q: Has that problem been fixed?
"A: It's been operated on.
"Q: That was also by Dr. Standeffer; is that right?
"A: That's true.
"Q: Did workers' comp pay for that?
"A: No.
"Q: Your own health insurance?
"A: Yes.
"Q: You still have health insurance?
"A: True.
 "Q: Okay. You're not claiming that your back or your shoulder are a part of this lawsuit, are you?
 "A: My back has hurt me worse since my knees have been — of course, and it's like he said, it's all tied together.
"Q: Who said that?
"A: Dr. Standeffer.
"Q: I'm just asking —
"A: I don't know.
 "Q: You don't have in your complaint any mention about your back or your shoulder. You're not claiming that, are you?
"A: No.
 "Q: It's your knees that are really keeping you from working?
"A: My knees are keeping me from working.
"Q: Okay.
"A: But now my back does give me problems.
"Q: Are you still seeing anybody for that?
 "A: I hadn't seen anybody lately, but Dr. Standeffer is the only one.
"Q: Is he giving you medicine for it?
"A: Yes. I have muscle relaxers I take.
"Q: And when did he fix your shoulder?
"A: In December, middle of December [2000].
"Q: And is it better now?
"A: It's better."
On March 26, 2001, several hours after the conclusion of the deposition, Roberts filed an "Amendment to Complaint," which was also verified by Roberts and notarized. In this amendment, Roberts alleged: "Further, as a result of the injuries to his knees, the Plaintiff has sustained an injury to his back and limitations therefrom." There was no mention in the amendment of any claim for a shoulder injury.
On April 21, 2001, Fort James filed a motion to strike Roberts's amendment to his complaint, asserting that Roberts had unduly delayed in notifying Fort James of a claim for compensation due to a back injury. Fort James contended that it would be prejudiced by the amendment because it had already conducted its discovery in the case and had prepared its defense based on Roberts's allegation that his injuries were limited to his knee injuries. In the alternative, if the amendment were allowed, Fort James requested that Roberts be required to respond again to all previous written discovery and that Roberts be required to pay the additional costs incurred in obtaining the additional *Page 840 
discovery, including the cost of a second deposition.
Roberts responded to the motion to strike by citing Rule 15(a), Ala. R. Civ. P., which states, in pertinent part, that "a party may amend a pleading without leave of court, but subject to disallowance on the court's own motion or a motion to strike of an adverse party, at any time more than forty-two (42) days before the first setting of the case for trial, and such amendment shall be freely allowed when justice so requires." Roberts filed an affidavit from his counsel stating that the filing of the amendment on the very day of the deposition was a coincidence and that it was the result of confusion between two different attorneys who were working on Roberts's case. In support of his response to the motion to strike, Roberts submitted medical records dated February 21, 2000, and August 1, 2000, which mentioned his complaint of back tenderness. The February 2000 records indicate that Roberts related his back tenderness to a fall that had occurred when his knee gave way.
On July 12, 2001, the trial court denied Fort James's motion to strike Roberts's amendment to his complaint. The court made no ruling on Fort James's request for alternative relief with respect to the expense of additional discovery. Fort James nonetheless proceeded to propound a second set of interrogatories to Roberts. After receiving Roberts's responses to those interrogatories, Fort James noticed a second deposition of Roberts in order to question him regarding his claims for compensation for a back injury. The parties set the deposition to be held in Butler on November 13, 2001.
On November 13, 2001, Fort James's counsel traveled from Mobile to Butler for the scheduled deposition. While counsel was en route to Butler, however, counsel for Roberts sent a letter by facsimile transmission to the office of Fort James's counsel. The letter from Roberts's counsel stated:
 "Please find enclosed a copy of a note from Dr. Standeffer that was just brought in to me by Jimmy Roberts. In view of this, I don't think it will be necessary to take the deposition of Jimmy Roberts this morning. Please call me before you leave coming up here."
The note from Dr. Standeffer stated:
 "Jimmy Roberts is a patient of mine that has been seen with DJD [degenerative joint disease] in both of his knees. He has seen me in the past for the onset of back pain which he advised me occurred after his knee gave way. His back pain has resolved and he has not had any recent problems although he has asked me if there is a chance that this could recur or could be reinjured in view of his knee giving way at a later date. I have advised him that I do believe that this is a possibility although the likelihood of this possibility would be difficult to estimate. If I can be of further assistance, please contact me."
When Fort James's counsel arrived in Butler and learned of the letter from Roberts's counsel and the note from Dr. Standeffer, he agreed to the suggestion of counsel for Roberts that the second deposition of Roberts be canceled.
On May 7, 2002, Roberts filed a second "Amended Complaint." In this second amended complaint, Roberts alleged that it had been his left knee that was injured on January 20, 1997, not his right, as he had alleged in his original complaint. He further alleged in this second amended complaint that he had injured his right knee when he had to make "a three-foot step down," not his left knee as originally alleged, and that this injury occurred on February 9, 1997. The second amended complaint made no mention of a second *Page 841 
injury to Roberts's left knee in October 1997, as did the original complaint; instead it alleged that Roberts injured his left knee a second time on September 29, 1997, when he slipped off a piece of pipe. Consistent with the developments and communications of November 13, 2001, the second amended complaint contained no mention of any back injury; the only alleged injuries for which compensation was claimed in the second amended complaint were the alleged injuries to Roberts's knees. This second amended complaint also was verified by Roberts and notarized.
Fort James moved to strike the second amended complaint on the ground that it appeared from the face of the complaint that the new allegation of a September 1997 knee injury was barred by the statute of limitations and that this claim did not relate back to the date of filing of the first complaint because it involved a different incident than those that had previously been alleged. It does not appear from the materials submitted by the parties that the trial court ever ruled on Fort James's motion.
On May 29, 2002, the trial court set a trial for September 5, 2002, apparently based on the claims and defenses as set forth in the second amended complaint and Fort James's answer thereto. On July 23, 2002, after discovery had been completed and the case had been set for trial, Fort James filed a motion for a summary judgment. Citing § 25-5-57(a)(3)a. and d. as statutory authority, and relying on the Alabama Supreme Court's 1969 opinion in LeachManufacturing Co. v. Puckett, 284 Ala. 209, 224 So.2d 242
(1969), and the Supreme Court's May 31, 2002, opinion in Exparte Drummond Co., 837 So.2d 831 (Ala. 2002), Fort James argued that, because Roberts had not alleged that the effect of the workplace injuries to his knees "extend[ed] to other parts of the body and interfere[d] with their efficiency," Roberts was not entitled to compensation payments other than by reference to the schedule provided in § 25-5-57(a)(3)a. Thus, argued Fort James, Roberts had already received all the payments to which he was entitled, there was no genuine issue of material fact, and Fort James was entitled to judgment as a matter of law.
On August 29, 2002, only a week before the case was scheduled to be tried, Roberts filed a motion seeking leave to amend his complaint for a third time. That motion stated in its entirety:
 "Comes the Plaintiff and moves the Court for permission to amend his complaint by adding a claim for injury to Plaintiff's shoulder and pain in his lower back as a result of the injuries to his knees[.] This is shown in the attached Amendment to Complaint.
"This 29th day of August, 2002."
In this proposed third amendment to his complaint, Roberts sought compensation for lower-back pain allegedly resulting from his knee injuries. In addition, this proposed third amendment to Roberts's complaint contained, for the first time, a claim by Roberts for compensation for an impairment to his shoulder allegedly resulting from his knee injuries. This proposed third amendment was, again, verified by Roberts and notarized. The proposed third amendment stated in its entirety:
 "Comes the Plaintiff and amends his complaint by adding the following to paragraph number one (1) to the original complaint:
 "`Further, as a result of the injuries to his knees, on or about December 5, 2000, Plaintiff fell and sustained an injury to his shoulder and has limitations therefrom. Further, the Plaintiff contends that the injuries to *Page 842 
his knees are causing him to have pain in his low back.'
"This 29 day of August, 2002.
"/s/ Jimmy Roberts"
Along with the proposed third amendment to his complaint, Roberts filed a motion to continue the trial, asserting as grounds for the motion that he might require additional discovery as a result of the new allegations. In a brief that accompanied his motion to amend the complaint, Roberts contended that the Supreme Court's decision in Drummond Co. had "changed the standard for consideration of an injury to scheduled members as an injury to the body as a whole." (Emphasis added.) The trial court granted the motion to continue and set the motion to amend the complaint for a hearing. Following a November 2002 hearing, the trial court, on January 9, 2003, granted Roberts's motion for leave to amend his complaint.
Fort James petitions this court for a writ of mandamus directing the trial court to set aside Roberts's third amendment to his complaint on the grounds that the trial court abused its discretion in permitting the amendment. Fort James argues (a) that Drummond Co. did not actually change the legal standard at issue, and (b) that there was no "good cause," as required by Rule 15(a), Ala. R. Civ. P., for the trial court to grant leave to Roberts to file the third amendment to his complaint.
 "`A writ of mandamus is an extraordinary remedy, and it will be "issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court." Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala. 1993). A writ of mandamus will issue only in situations where other relief is unavailable or is inadequate, and it cannot be used as a substitute for appeal. Ex parte Drill Parts Serv. Co., 590 So.2d 252 (Ala. 1991).'"
Ex parte Wilson, 854 So.2d 1106, 1108-09 (Ala. 2002) (quotingEx parte Empire Fire Marine Ins. Co., 720 So.2d 893, 894
(Ala. 1998)).
Rule 15(a) states:
 "Unless a court has ordered otherwise, a party may amend a pleading without leave of court, but subject to disallowance on the court's own motion or a motion to strike of an adverse party, at any time more than forty-two (42) days before the first setting of the case for trial, and such amendment shall be freely allowed when justice so requires. Thereafter, a party may amend a pleading only by leave of court, and leave shall be given only upon a showing of good cause. A party shall plead in response to an amended pleading within the time remaining for a response to the original pleading or within ten (10) days after service of the amended pleading, whichever period may be longer, unless the court orders otherwise."
(Emphasis added.)
We agree with Fort James that the issuance by the Supreme Court of its opinion in Drummond Co. was not "good cause" for that amendment within the meaning of Rule 15(a). Our Supreme Court's decision in Drummond Co. made no appreciable change, at least for purposes of the issue presented in this case, in the law regarding the entitlement of an employee to compensation for an impairment to a nonscheduled part of his or her body that arises from a workplace injury to a scheduled member of his or her body. In language that was essentially reiterated inDrummond Co., the Supreme Court *Page 843 
stated in the seminal case of Bell v. Driskill:
 "[A]lthough the injury itself is to only one part or member of the body, if the effect of such injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under the [Workers'] Compensation Law to the amount allowed under the schedule for injury to the one member."
282 Ala. 640, 646, 213 So.2d 806, 811 (1968) (emphasis added) (relied upon in Leach Manufacturing Co. v. Puckett,284 Ala. 209, 224 So.2d 242). The Supreme Court in Bell made it clear that it was relying upon Professor Larson's treatise on workers' compensation law for the rule it adopted:
 "`The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'"
Bell v. Driskill, 282 Ala. at 645, 213 So.2d at 810 (quoting 2 Larson, Workmen's Compensation Law § 58.20, pp. 44-45) (emphasis added).
In language that again quoted Professor Larson's articulation of the standard for entitlement to compensation when the effect of the loss of a scheduled member extends to other parts of the body, the Supreme Court stated in Drummond Co.:
 "We renew our commitment to the policy that underlay the Bell test and that is recognized in the current edition of 4 Lex K. Larson, Larson's Workers' Compensation Law § 87.02 (2001):
 "`The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'
 "(Footnote omitted.) This language remains unchanged from the edition of the Larson treatise on which this Court relied in Bell. Because of the confusion that has developed surrounding the Bell test, we today adopt the language recited above from Larson, Workers' Compensation Law § 87.02, as the test for determining whether an injury to a scheduled member should be treated as unscheduled."
837 So.2d at 834 (footnote omitted; emphasis added).
Thus, under the law as articulated both in Drummond Co. and
in the cases preceding Drummond Co., dating back to Bell v.Driskill, if the loss of a scheduled member, or the loss of use of that member, impaired some other, nonscheduled part of the employee's body, that impairment was and still is compensable. The fact that Drummond Co. reaffirmed that compensability was no occasion for Roberts to amend his complaint to assert such an impairment.[1] *Page 844 
If Drummond Co. worked any readily discernible "change" in the law, it was not a change in the legal standard for awarding compensation for impairments to non-scheduled parts of the body; rather, it was a change — a reining in, if you will — of the manner of computing benefits where the only impairment claimed is to a scheduled member. As the Supreme Court explained in Drummond Co., cases decided since Bell v.Driskill had expanded the Bell test to include, as effects that would take a scheduled injury outside the schedule: "(1) pain, swelling, and discoloration; (2) work restrictions; (3) impairment ratings to the body as a whole; and (4) vocational disabilities." 837 So.2d at 834 (footnotes omitted). The Supreme Court also noted that it appeared that this court had "considered [a] worker's ability to find future employment as a factor in deciding whether an injury to a scheduled member should be compensated outside the schedule." Id. The purpose of Roberts's third amendment to his complaint in the present case, however, was to seek compensation outside the schedule for nonscheduled
parts of his body. The change effected by Drummond Co. in the standard for seeking compensation outside the schedule for scheduled parts of the body would be inapplicable to impairments for the nonscheduled body parts (back and shoulder) described in Roberts's proposed amendment and would not provide a "good cause" for Roberts to seek leave for that amendment when he did.
Roberts also contends that the third amendment to his complaint should have been allowed on the ground that it was only shortly before the filing of that complaint that Roberts finally concluded that his shoulder and knee injuries were not going to disappear and that they were a result of his workplace injury. The policy reasons underlying the restriction in Rule 15(a) on the right of plaintiffs to amend their complaints within 42 days of trial are well illustrated by the present case. Roberts's proposed third amendment to his complaint, reviving a previously withdrawn claim for compensation for an impairment to his back and asserting for the first time a claim for compensation for impairment to his shoulder, was sought only one week before trial. It came more than three years after Roberts had filed his original complaint, and approximately two years after Roberts had experienced problems with both his back and his shoulder. If Roberts's amendment were allowed, the investment of time, effort, and *Page 845 
financial resources the parties have made for three years in discovery, in trial preparation, and in otherwise "litigating" this case up until the week before the trial was to begin would have to be repeated in significant measure, and the trial would have to be delayed yet again.
Under Rule 15(a), in order to obtain leave of the trial court to file the third amendment to his complaint, Roberts had the burden of showing "good cause." Further, even if a party makes a showing of good cause, the trial court does not have unbridled discretion, but must consider whether a proposed amendment will result in undue delay or prejudice to the defendant. See Steadv. Blue Cross-Blue Shield of Alabama, 294 Ala. 3, 6,310 So.2d 469, 471 (1975) (quoted with approval in Ex parte Bailey,814 So.2d 867 (Ala. 2001)). Cf. Ex parte Liberty Nat'l Life Ins.Co., 858 So.2d 950, 954 (Ala. 2003) (explaining that when "good cause" is shown for an amendment to a complaint filed after the 42-day period before the first setting of the case for trial has expired, a denial of the leave to amend must be based on a "valid ground" for doing so, such as actual prejudice or undue delay). Based on our review of the particular procedural history presented here, including the various pleadings filed by Roberts and the third amendment to the complaint, itself, and the timing and posture of the issue as presented to the trial court, we are of the firm conclusion that the trial court abused its discretion in granting Roberts leave to file the third amendment.
In light of the foregoing, we issue a writ of mandamus directing the Choctaw Circuit Court to vacate its order allowing Roberts's third amendment to his complaint.
APPLICATION OVERRULED; OPINION OF JANUARY 16, 2004, WITHDRAWN; OPINION SUBSTITUTED; PETITION GRANTED; WRIT ISSUED.
CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
YATES, P.J., concurs in the result, without writing.
[1] Our Supreme Court's decision in Drummond Co. might logically have been viewed as a "cause" for Roberts to amend his complaint to make claims for the first time for impairments to nonscheduled parts of his body if such impairments had not been compensable before Drummond Co. was decided but had become compensable for the first time with the issuance of the DrummondCo. opinion. Under that scenario, it would arguably make sense for Roberts not to have bothered to include in his complaint any claims for impairment to nonscheduled parts of his body untilDrummond Co. made recovery for such impairments possible. However, no decision of our Supreme Court or of this court sinceBell v. Driskill has ever indicated that an employee was not entitled to compensation for impairments to nonscheduled parts of his or her body as a result of a workplace injury to a scheduled member.
Further, even assuming hypothetically that Drummond Co. had changed the way we consider and compute compensation for impairment to nonscheduled parts of an employee's body, its issuance still would not have been good cause for Roberts to amend his complaint when he did. The problem for Roberts in this case would still have been that, until almost literally the eve of trial, he had not made a claim for compensation for any impairment to his back, his shoulder, or any other nonscheduled part of his body. Regardless of whether a plaintiff would be governed in his or her claim for compensation for impairment to a nonscheduled part of his or her body under the standard articulated in Drummond Co., or under a previous standard, the fact would remain that he or she would still have to actually make that claim. Put differently, with or without a change in the manner of measuring compensation for impairment to nonscheduled parts of an employee's body, an employee must still make known to the employer the nonscheduled impairments for which he or she seeks compensation. A Drummond Co. decision of the nature assumed for the purposes of this paragraph would not have imposed any new or added obligation on Roberts to actually claim an impairment to whatever parts of his body he claims were impaired.