MOORE, Judge.
 

 ArvinMeritor, Inc. (“the employer”), appeals from a judgment of the Fayette Circuit Court awarding Warren Handley permanent-total-disability benefits. We remand the case for the trial court to consider certifying the judgment as final pursuant to Rule 54(b), Ala. R. Civ. P.
 

 Facts
 

 On November 17, 2003, Handley, along with several hundred other plaintiffs, filed a complaint against the employer and several of its managers seeking workers’ compensation benefits and civil damages on account of exposure to toxic chemicals in the workplace. The plaintiffs amended their complaint to add over 100 additional plaintiffs and 64 more corporate defendants. The trial court subsequently entered a summary judgment in favor of the managers on all the plaintiffs’ claims and in favor of the employer on all the plaintiffs’ claims except for the workers’ compensation claims. Additionally, other claims remain pending against other corporate defendants.
 

 The employer subsequently moved for a summary judgment on Handley’s workers’ compensation claim. The trial court denied that motion. On May 18, 2006, the trial court ordered that Handley’s workers’ compensation claim be tried separately pursuant to Rule 42, Ala. R. Civ. P. On July 26, 2006, the trial court entered a judgment awarding Handley permanent-total-disability benefits. From that judgment, the employer appealed.
 

 Discussion
 

 “We first consider whether we have jurisdiction over this appeal, because ‘jurisdictional matters are of such magnitude that we take notice of them at any time and do so even
 
 ex mero motu.’
 
 ”
 
 Wallace v. Tee Jays Mfg. Co.,
 
 689 So.2d 210, 211 (Ala.Civ.App.1997) (quoting
 
 Nunn v. Baker,
 
 518 So.2d 711, 712 (Ala.1987)).
 

 This court has jurisdiction over appeals from workers’ compensation judgments,
 
 see
 
 Ala.Code 1975, § 25-5-81(e) and § 12-3-10, but only if they are final judgments.
 
 See Norment Sec. Group v. Chaney,
 
 938 So.2d 424 (Ala.Civ.App.2006). A final judgment is a judgment that con-
 
 *676
 
 elusively determines all the issues before the court and ascertains and declares the rights of all the parties involved.
 
 See Garner v. Decatur Utils.,
 
 709 So.2d 1809, 1810 (Ala.Civ.App.1998). A judgment that does not resolve all the claims asserted by all the parties is an interlocutory order that will not support an appeal.
 
 See Stone v. Haley,
 
 812 So.2d 1245, 1246 (Ala.Civ.App.2001). The judgment in this case conclusively determined all the claims that Hand-ley had asserted against the employer; however, the judgment did not dispose of the remaining claims asserted by the hundreds of other plaintiffs against the employer and the other corporate defendants. Therefore, the judgment is not final.
 

 The judgment against the employer on Handley’s workers’ compensation claim would have been final had the trial court severed Handley’s claim from the remaining claims and assigned that claim a separate civil action number.
 
 See
 
 Rule 21, Ala. R. Civ. P. (“Any claim against a party may be severed and proceeded with separately.”). After severance, the only claim before the trial court would have been Hand-ley’s workers’ compensation claim against the employer, and the trial court’s July 26, 2006, judgment conclusively decided that claim. However, the trial court did not effectuate a severance of Handley’s workers’ compensation claim by simply ordering a separate trial under Rule 42.
 
 See Certain Underwriters at Lloyd’s, London v. Southern Natural Gas Co.,
 
 939 So.2d 21 (Ala.2006). Hence, Handley’s workers’ compensation claim remains part of the action in which the claims of several hundred other plaintiffs have not been adjudicated.
 

 Under Rule 54(b), “[w]hen more than one claim for relief is presented in an action, ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for entry of judgment.” Absent a Rule 54(b) certification, the judgment entered in favor of Handley did not terminate the action and the judgment therefore remains subject to revision at any time before final adjudication.
 
 See
 
 Rule 54(b). In this case, the trial court did not certify its July 26, 2006, judgment as final pursuant to Rule 54(b). Ordinarily, we would dismiss this appeal as being from a nonfinal judgment; however, we elect to exercise our discretion to remand the case for 28 days so that the trial court may certify the judgment as final pursuant to Rule 54(b), if appropriate, so as to allow for the exercise of our appellate jurisdiction.
 
 See Bridges v. Bridges,
 
 598 So.2d 935, 936 (Ala.Civ.App.1992).
 

 On remand, the burden is on the employer, as the party seeking immediate appellate review of a judgment that does not adjudicate all the claims of all the parties, to make a showing as to why it is necessary that appellate review of the judgment be conducted before termination of the entire case.
 
 See Brown v. Whitaker Contracting Corp.,
 
 681 So.2d 226, 229 (Ala.Civ.App.1996) (overruled on other grounds by
 
 Schneider Nat’l Carriers, Inc. v. Tinney,
 
 776 So.2d 753 (Ala.2000)). If it is convinced that there is no just reason for delay, the trial court may certify the July 26, 2006, judgment as final under Rule 54(b) so that this court may assert its appellate jurisdiction. Failure by the trial court to make a return to this court within 28 days from the date of the release of this opinion shall result in the dismissal of this appeal as being from a nonfinal judgment.
 

 REMANDED WITH INSTRUCTIONS.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 
 *677
 

 On Return to Remand
 

 MOORE, Judge.
 

 ArvinMeritor, Inc. (“Arvin”), appeals from a judgment entered in Fayette Circuit Court (“the trial court”) on July 6, 2006. In that judgment, the trial court awarded Warren Handley (“Handley”) workers’ compensation benefits based on its finding that Handley had become permanently and totally disabled from various occupational diseases arising out of and in the course of his employment with Arvin. We affirm in part, reverse in part, and remand with instructions.
 

 Procedural History
 

 On November 17, 2003, Handley, along with several hundred other plaintiffs, filed a complaint in the trial court against Ar-vin, several individually named former managers of Arvin, and a number of fictitious party defendants. In their complaint, the plaintiffs alleged that they had each been employed by Arvin and that, as a result of that employment, they had sustained injury by way of exposure to toxic and dangerous chemicals. The plaintiffs asserted claims based on workers’ compensation, co-employee liability, misrepresentation, suppression and deceit. Arvin removed the case to the United States District Court for the Northern District of Alabama on December 19, 2003. The United States District Court remanded the case to the Fayette Circuit Court on January 9, 2004.
 

 On May 5, 2005, the plaintiffs filed an amended complaint, adding more plaintiffs and alleging further claims against a number of third-party defendants, who allegedly designed, manufactured, and distributed the chemicals that caused the plaintiffs’ alleged injuries, for negligence and wantonness, violations of the Alabama Extended Manufacturers Liability Doctrine (“AEMLD”), civil conspiracy, and outrage. Arvin filed an answer on June 1, 2005; Arvin pleaded a number of defenses, including res judicata, collateral estoppel, and statute of limitations. Arvin and a number of the other defendants filed motions to dismiss or, in the alternative, motions for summary judgment; Arvin’s motion was filed on November 30, 2005. Those motions were denied by the trial court on March 27, 2006.
 

 On March 23, 2006, Handley filed a motion alleging that he had been diagnosed with polymyositis and had been hospitalized, and that his condition had deteriorated to a grave and alarming degree and requesting that his workers’ compensation claim be tried as soon as possible. On March 28, 2006, the trial court set Hand-ley’s trial date for June 8, 2006. On April 28, 2006, Arvin filed a renewed motion for a summary judgment that addressed only Handley’s claims. The trial court denied that motion for a summary judgment on June 1, 2006.
 
 [1]
 

 On June 8, 2006, Arvin filed a motion in limine to exclude the findings, reports, and opinions of Handley’s experts, Dr. Eugene A. Mangieri and Lori Andrews. On June 15, 2006, the trial court reset the trial date for June 29, 2006. After a two-day bench trial, the trial court entered a judgment on July 6, 2006, awarding Handley permanent-total-disability benefits and taxing costs to Arvin. On July 31, 2006, the trial court entered an order granting Handley’s motion for costs in the amount of
 
 *678
 
 $105,682.77. Arvin filed a motion for reconsideration of the trial court’s award of costs on August 8, 2006; on September 28, 2006, the trial court reduced the cost award to $83,312.16.
 

 Arvin filed a notice of appeal on August 17, 2006. On November 6, 2006, Arvin filed a motion in the trial court for relief from the judgment, requesting a new trial because of newly discovered evidence located in Handley’s Social Security disability file. The trial court denied Arviris motion for relief from the judgment on January 11, 2007.
 

 On November 16, 2007, this court remanded the case to the trial court so that the trial court could certify its July 6, 2006, judgment, which failed to adjudicate the claims of the remaining plaintiffs, as final.
 
 ArvinMeritor, Inc. v. Handley, 12
 
 So.3d 669 (Ala.Civ.App.2007). On November 30, 2007, the trial court entered an order certifying that order as final, pursuant to Rule 54(b), Ala. R. Civ. P.
 

 Res Judicata
 

 On appeal, Arvin raises numerous issues. The court first addresses Arviris argument that the claims raised in Hand-ley’s November 2003 complaint are barred by the doctrine of res judicata.
 

 Arvin introduced into evidence a judgment entered by the trial court on October 17, 2002. That judgment indicated that Handley claimed injuries to his cervical spine occurring on May 9, 1999, and May 18, 2001. The judgment recited that the parties had mediated those claims with the assistance of an ombudsman,
 
 see
 
 Ala.Code 1975, § 25-5-292(a), and that they reached a settlement agreement, which was attached to the judgment. That agreement, dated September 23, 2002, and signed by both parties and their attorneys, indicated that the issues in dispute involved only the two claimed cervical-spine injuries and that the parties had agreed that Arvin would pay Handley $60,000 and would pay his attorney $2,000 for expenses to close all issues relating to those injuries. Arvin also agreed that it would waive any right to setoff against its liability any amounts paid to Handley as short-term disability or disability-retirement benefits.
 
 See
 
 Ala. Code 1975, § 25-5-57(c).
 

 Although the September 23, 2002, written agreement did not refer to a release of any claims or causes of actions relating to other injuries or occupational diseases, the judgment states:
 

 “As part of the parties’ settlement agreement, the plaintiff will release the defendant from any and all other workers’ compensation claims arising out of the plaintiffs employment with the defendant. ...”
 

 Thereafter, the judgment approves the settlement and specifically orders:
 

 “The defendant is released from any and all other liability to the plaintiff for any other workers’ compensation claim or cause of action arising out of the plaintiffs employment with the defendant.”
 

 Arvin asserted in its answer the defense of res judicata, noting that several of the plaintiffs had already received workers’ compensation benefits.
 
 [2]
 
 Arvin argues
 
 *679
 
 that the last two quoted provisions of the judgment effectively adjudicated any and all workers’ compensation claims Handley had against Arvin, including Handley’s claims for benefits due to the contraction of an occupational disease as asserted in the November 2008 complaint.
 

 “The elements of res judicata are: ‘(1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of parties, and (4) with the same cause of action presented in both actions.’
 
 Equity Res. Mgmt., Inc. v. Vinson,
 
 723 So.2d 634, 636 (Ala.1998). Tf those four elements are present, then any claim that was, or that could have been, adjudicated in the prior action is barred from further litigation.’ 723 So.2d at 636. ‘Res judicata, therefore, bars a party from asserting in a subsequent action a claim that it has already had an opportunity to litigate in a previous action.’
 
 Lee L. Saad Constr. Co. v. DPF Architects, P.C.,
 
 851 So.2d 507, 517 (Ala.2002).”
 

 Lloyd Noland Found., Inc. v. HealthSouth Corp.,
 
 979 So.2d 784, 793 (Ala.2007). The burden was on Arvin, as the party asserting res judicata, to prove all of the essential elements of the defense.
 
 Stewart v. Brinley,
 
 902 So.2d 1, 11 (Ala.2004).
 

 The parties disagree solely on the identity-of-issues element; therefore, we will assume, without deciding, that the other elements of res judicata have been established.
 
 See
 
 Ala.Code 1975, § 25-5-56 (giving judgments approving settlements conclusive and binding effect);
 
 see also Lawrence v. U.S. Fidelity & Guar. Co.,
 
 226 Ala. 161, 145 So. 577 (1933) (holding that judgment approving settlement may be given res judicata effect); Ala.Code 1975, § 25-5-292(f)(2) (conferring jurisdiction on compensation court to review and approve settlement mediated by ombudsman at benefit review conference). “ ‘ “[T]he principal test for comparing causes of action [for the application of res judicata] is whether the
 
 primary right and duty or wrong
 
 are the same in each action.” ’ ”
 
 Old Republic Ins. Co. v. Lanier,
 
 790 So.2d 922, 928 (Ala.2000) (quoting
 
 Wesch v. Folsom,
 
 6 F.3d 1465, 1471 (11th Cir.1993)).
 

 In
 
 Blue Circle, Inc. v. Williams,
 
 579 So.2d 630 (Ala.Civ.App.1991), this court considered the identity-of-issues element in a case very similar to this one. In
 
 Williams,
 
 the employee sustained two successive employment-related injuries, one in 1985 and one in 1987, to the same wrist. Apparently after the 1987 injury, the employee and the employer entered into a settlement agreement referencing only the 1985 wrist injury and stating that the benefits paid to the employee pursuant to the settlement agreement were benefits “arising out of the injury described herein above.” 579 So.2d at 632. In the judgment approving that settlement,
 

 “the Circuit Court of Jefferson County entered a decree, which provided that the ‘payment made hereunder shall constitute full and complete payment of
 
 any and all obligations owing the [employee] by the [employer].’
 
 ”
 

 Id.
 
 (emphasis added). The employee then filed a civil action for benefits due for the 1987 wrist injury. The employer argued that the language of the judgment approving the settlement barred the action. The trial court determined that the specific reference to the 1985 injury in the settlement agreement and the absence of any reference to the 1987 injury unambiguous
 
 *680
 
 ly indicated that the parties intended for the settlement to apply only to the former injury. 579 So.2d at 633. “In view of the language of the settlement agreement,”
 
 id.,
 
 this court held that the trial court did not err by failing to give res judicata effect to the judgment entered by the trial court.
 

 It appears from
 
 Williams
 
 that when a judgment approves a workers’ compensation settlement that itself has been reduced to a prior, separate writing, the trial court may, in assessing a res judicata defense, refer to that writing to determine the issues resolved by a judgment approving the settlement even if the language of the judgment unambiguously relieves the employer of any other liability to the employee.
 
 [3]
 
 In this case, the agreement memorializing the September 23, 2002, settlement was actually attached to the judgment, giving the trial court even more authority to review the writing to determine the scope of the issues resolved by its October 17, 2002, judgment. As the trial court concluded, the settlement agreement references only the cervical-spine injuries and specifically states that the settlement proceeds are being paid to close all issues relating to those injuries. Based on the reference only to the cervical-spine injuries, and the lack of reference to any other injuries or causes of action, it is evident, as was the case in Williams, that the parties did not intend to resolve any other workers’ compensation claims when they entered into the September 23, 2002, settlement.
 
 [4]
 

 In
 
 Williams,
 
 the language of the judgment approving the settlement was far broader than the language of the settlement itself. The judgment purported to absolve the employer of “any and all obligations owing the [employee] by the [employer],” not simply for the 1985 wrist injury. If given effect, such broad language would not only have relieved the employer of liability for the 1987 wrist injury, but also for any other workers’ compensation claim or civil injury. In this case, the language of the judgment approving the settlement is not as broad as that employed in
 
 Williams;
 
 however, it purports to absolve Arvin of liability under the Act not only for Handley’s cervical-spine injuries but also for any and all other workers’ compensation claims and causes of actions Handley had against Arvin. In light of the holding in
 
 Williams
 
 and in view of the language of the settlement agreement, we reject the contention that the issue of Handley’s right to workers’ compensation benefits on account of his alleged contraction of occupational injuries or diseases arising out of and in the course of his employment with Arvin was adjudicated in the October 17, 2002, judgment. We therefore reject Arvin’s res judicata argument.
 

 Statute of Limitations
 

 Arvin next argues that Handley’s claim is barred by the statute of limitations.
 
 *681
 
 Because the trial court awarded benefits pursuant to the occupational disease article,
 
 see
 
 Ala.Code 1975, § 25-5-110 et seq., the statute of limitations applicable to claims for occupational disease applies. Section 25-5-117 provides, in pertinent part:
 

 “In case of the contraction of an occupational disease ... or of injury or disability resulting therefrom, a claim for compensation as defined in Section 25-5-1 shall be forever barred unless within two years after the date of the injury, as hereinafter defined, the parties shall have agreed upon the compensation payable under this article, or unless within two years after the date of the injury, one of the parties shall have filed a verified complaint as provided in Section 25-5-88.”
 

 Ala.Code 1975, § 25-5-117(a). The “date of injury” generally means “the date of the last exposure to the hazards of the disease in the employment of the employer in whose employment the employee was last exposed to the hazards of the disease.” Ala.Code 1975, § 25-5-117(b).
 

 In his complaint filed on November 17, 2003, Handley basically alleged that he contracted occupational diseases as a result of toxic exposure to chemicals in his workplace at the Arvin plant in Fayette, Alabama. In pretrial discovery, Handley clarified that he had been diagnosed with polymyositis and was being treated for that disease along with complications from that disease. At trial, Handley additionally claimed that he had contracted chronic bronchitis and Chronic Obstructive Pulmonary Disease (“COPD”).
 

 The evidence adduced at trial revealed that, although Handley remained on the payroll at Arvin until he was laid off on December 14, 2001, he actually last worked on May 18, 2001, after which he went on a leave of absence. An Arvin witness testified that after May 2001, Handley was considered a nonactive employee and that Arvin’s policy prohibited him from entering the production area of the plant. Nevertheless, Handley’s wife testified that Handley had visited the Arvin plant to pick up his paychecks
 
 [5]
 
 dated November 30, 2001, and December 6, 2001.
 
 [6]
 
 Those checks were located in an office that opened up into the production area of the plant. When Handley would pick up his checks, he would visit with his co-employees for 10 or 15 minutes in the production area. Handley’s wife testified that the air was smokey in the plant at that time. Lori Andrews, an occupational and environmental health specialist, testified that during those visits, “a hazardous exposure resulted.”
 

 Arvin initially asserts that any exposure Handley experienced in November and December 2001 was outside the course of his employment. “In no case ... shall an employer be liable for compensation by reason of the contraction of an occupational disease ... unless such disease arose out of and in the course of the employment .... ” Ala.Code 1975, § 25-5-111. The term “in the course of the employment” refers to the time, place and circumstances under which the occupational disease is contracted.
 
 See Moesch v. Baldwin County Elec. Membership Corp.,
 
 479 So.2d 1271, 1272 (Ala.Civ.App.1985).
 
 *682
 
 An occupational disease occurs in the course of the employment when it occurs within the period of the employment, at a place where the employee may reasonably be, and while he or she is reasonably fulfilling the duties of his or her employment, or is engaged in something incidental to it.
 
 Ex parte Holton,
 
 886 So.2d 83, 85 (Ala.2003). An employee who is exposed to the hazards of contracting an occupational disease while picking up his paycheck on the employment premises at a reasonable time and in a reasonable manner is within the course of his employment.
 
 See generally Barrett v. Lee Brass Co., 883
 
 So.2d 227 (Ala.Civ.App.2003);
 
 Oliver v. Faulkner Wood Co.,
 
 531 So.2d 675 (Ala.Civ.App.1988); and
 
 Process Equipment, Inc. v. Quinn,
 
 701 So.2d 29 (Ala.Civ.App.1997);
 
 see also
 
 2 Larson & Larson,
 
 Larson’s Workers’ Compensation Law
 
 § 26.03[1].
 

 The Arvin representative testified that Handley was not required to pick up his paycheck in person, but that he had designated his wife to pick up his checks and Arvin also could have mailed the checks to him. However, Handley presented testimony from several witnesses that Arvin employees routinely picked up their checks personally at the plant. No evidence indicated that an employee who designated someone else to retrieve his or her paychecks was thereafter precluded from collecting the checks personally. It appears that the Arvin employee charged with disbursing the paychecks gave Hand-ley his check on each occasion. Alabama law generally holds that an activity that occurs on the employment premises with the knowledge and acquiescence of management so often that it has become part of the usual custom of the employment is considered within the course of the employment.
 
 See Tucker v. Die-Matic Tool Co.,
 
 652 So.2d 263, 266 (Ala.Civ.App.1994) (“One of the factors to be considered in determining whether an accident arose out of and in the course of employment is the customary nature of the activity.”).
 

 Arvin next argues that its policies prohibited Handley from entering the production area while on nonactive status. Generally speaking, an employee injured while engaged in incidental activities in a forbidden zone is not within the course of the employment.
 
 See Havelin v. Poole Truck Lines, Inc.,
 
 395 So.2d 75 (Ala.Civ.App.1980);
 
 Jones v. Sloss-Sheffield Steel & Iron Co.,
 
 221 Ala. 547, 130 So. 74 (1930); and
 
 Ellis v. Little Cahaba Coal Co.,
 
 213 Ala. 244, 104 So. 422 (1925). However, when the employer does not enforce the rule prohibiting the employee from entering the unauthorized area, the employer may be deemed to have waived that rule.
 
 Moss v. Hamilton,
 
 234 Ala. 181, 174 So. 622 (1937). In this case, it is apparent that Arvin did not enforce its rule because it allowed Handley, on more than one occasion, to enter the production area to converse with his co-employees while on nonactive status. By waiving the rule, Arvin failed to effectively limit the course of the employment. Handley remained in the course of the employment while briefly talking with his co-employees on the employment premises while or immediately after collecting his paychecks.
 

 Arvin finally argues that Handley failed to prove that, during his short stays at the plant in November and December 2001, he was exposed to the hazards of contracting the occupational diseases for which he sought recovery. Arvin points out that in
 
 Dueitt v. Scott Paper Co.,
 
 695 So.2d 40 (Ala.Civ.App.1996), this court ruled that an employee’s claim for hearing loss was barred by the statute of limitations because the evidence showed that the employee had not been exposed at work to noise sufficient in duration and intensity to potentially cause hearing loss within two
 
 *683
 
 years prior to the filing of the suit. 695 So.2d at 43. The employer presented evidence that it had instituted a hearing conservation program in the early 1970’s; that it was mandatory for all employees to use ear plugs; that the employee complied with the rules, except for brief periods where he removed his ear plugs to carry on conversations or forgot to put them in; and that, as a result, the employee did not sustain any hearing loss that was related to occupational noise after the institution of the hearing conservation program. 695 So.2d at 42-43. This evidence established that the employee could not have been exposed to the hazards of contracting an occupational hearing loss during the two years prior to the filing of his claim.
 

 In
 
 Ex parte Dan River, Inc.,
 
 794 So.2d 386, 387 n. 1 (Ala.2000), our supreme court stated:
 

 “The particular date on which Higgins was last exposed to these materials, which he alleges were toxic, was not established in the record. Dan River contends that the statutory limitations period had expired before Higgins filed this action. However, the statute of limitations is an affirmative defense. Therefore, the burden was on Dan River to show that Higgins had not been exposed to the materials for more than two years before the filing of the complaint. ‘It is not necessary for the plaintiff to anticipate [the affirmative defense of the statute of limitations] and plead facts in avoidance thereof.’
 
 Ellis v. Black Diamond Coal Mining Co.,
 
 265 Ala. 264, 267, 90 So.2d 770, 773 (1956).”
 

 As
 
 Dan River
 
 illustrates, the employer bears the burden of proving that the employee was not exposed to the hazards of the disease within the statutory period. As will be explained in more detail in the next section, Arvin proved that Handley was never exposed to any substance at work that aggravated his polymyositis; however, Arvin has failed to cite to this court the evidence upon which it relies to support its contention that Handley was not exposed to inhalants in sufficient intensity and duration to potentially cause his other alleged occupational diseases. It is not the function of this court to search the record to find evidence to support a party’s argument.
 
 Fort James Operating Co. v. Irby,
 
 895 So.2d 282 (Ala.Civ.App.2004). Therefore, we cannot hold the trial court in error for finding that the statute of limitations had not expired on Handley’s claims for COPD and chronic bronchitis.
 

 Polymyositis
 

 Arvin next asserts that the trial court erred in concluding that Handley’s polymyositis is an occupational disease. An “occupational disease” is:
 

 “A disease arising out of and in the course of the employment ... which is due to hazards in excess of those ordinarily incident to employment in general and is peculiar to the occupation in which the employer is engaged .... A disease ... shall be deemed an occupational disease only if caused by a hazard recognized as peculiar to a particular trade, process, occupation, or employment as a direct result of exposure, over a period of time, to the normal working conditions of the trade, process, occupation, or employment.”
 

 Ala.Code 1975, § 25-5-110(1). The term “contraction of an occupational disease” includes “any aggravation of the disease without regard to the employment in which the disease was contracted.” Ala. Code 1975, § 25-5-110(5).
 

 To prove the first prong of the legal-causation standard set out in the statute, the employee must prove that the normal working conditions over a period of time exposed the employee to an increased
 
 *684
 
 risk of contracting the complained-of disease.
 
 See Ex parte Valdez,
 
 636 So.2d 401 (Ala.1994). An employee is exposed to an increased risk if employment conditions elevate the risk of contracting the disease beyond that of the risk faced by the general employment population.
 
 See, e.g., Drummond Co. v. Key,
 
 630 So.2d 473 (Ala.Civ.App.1993); and
 
 James River Corp. v. Mays,
 
 572 So.2d 469 (Ala.Civ.App.1990). To prove the second prong of the legal-causation standard, the employee must prove that the hazards in his or her normal working environment were “peculiar hazards,” i.e., hazards different in character than those found in the general run of occupations.
 
 Young v. City of Huntsville,
 
 342 So.2d 918, 921 (Ala.Civ.App.1976). The peculiar-risk standard is met if the employee presents sufficient evidence that he or she was exposed to a hazard in a substantially different manner than are persons in employment generally.
 
 Id.; see also Alatex, Inc. v. Couch,
 
 449 So.2d 1254 (Ala.Civ.App.1984).
 

 The question as to whether an employee has been exposed to an increased and peculiar risk of contracting an occupational disease by the normal working conditions of the employment over a period of time is a question of fact. The decision of the trial court on this issue of fact must be based on a preponderance of the evidence as contained in the record of the hearing. Ala.Code 1975, § 25-5-81(c);
 
 see also VF Jeanswear v. Taylor, 899
 
 So.2d 1002 (Ala.Civ.App.2004) (declining to apply clear-and-convincing-evidence standard to occupational-disease claims). In this case, the trial court found that Handley “suffers from polymyositis which condition was aggravated by Hand-ley’s exposure to toxic metals, metal fumes and other chemicals.” The trial court further found that Arviris plant “was a hazardous workplace and the risks associated with [Handley’s] and other workers’ exposures to these hazards was greater and substantially different than those found in employment generally.”
 

 When reviewing pure findings of fact in workers’ compensation cases, this court may reverse only if the findings are not supported by substantial evidence. Ala.Code 1975, § 25-5-81(e)(2). “Substantial evidence” is “ 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ”
 
 Ex parte Trinity Industries,
 
 680 So.2d 262, 269 (Ala.1996) (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)).
 

 The evidence at trial showed that Hand-ley was diagnosed with polymyositis in August 2002, after his employment with Ar-vin had been terminated. Polymyositis is a disease that causes the immune system to attack and consume healthy muscle tissue as a foreign substance. According to Dr. Eugene A. Mangieri, an anesthesiologist called as a medical expert for Hand-ley, polymyositis is classified medically as an idiopathic disorder, which means “we really don’t know the exact things that triggers the expression of this disease process in individuals” and “no one knows for sure what causes polymyositis.” Dr. Man-gieri testified that in peer-reviewed medical literature, polymyositis had never been described as an occupational disease or attributed to toxic chemical exposure of any kind. Based on that admission, Dr. Mangieri agreed that no peer-reviewed medical literature had ever shown any link between polymyositis exposure to the substances present in the Arvin workplace environment.
 

 Nevertheless, Dr. Mangieri testified that the “Arvin workplace” “probably triggered polymyositis.” Dr. Mangieri opined that Handley had a substantial amount of expo
 
 *685
 
 sure to environmental toxins while working at Arvin and that Handley’s occupational exposure
 

 “could have contributed to the expression of that disease which may have otherwise remained silent. I can’t tell you with a reasonable degree of certainty that that’s the case, but I can tell you with a reasonable degree of probability that when you perturb the immune system and you expose it to multiple environmental toxins over a long period of time and sensitize an individual, that the expression of autoimmune disease can be — ”
 

 At that point, Handley’s lawyer interrupted Dr. Mangieri and he did not complete his thought. Later, however, the doctor indicated that the exposure to chemicals at the Arvin workplace led to Handley’s respiratory ailments which, in turn, aggravated his polymyositis. To summarize, the following exchange took place:
 

 “[HANDLEY’S COUNSEL:] All right. Now, with respect to polymyosi-tis, before we move on, all you’re saying about polymyositis is, if I understand you correctly, is that the Arvin workplace exposure triggered and/or aggravated the polymyositis.
 

 “[DR. MANGIERI:] It certainly could.”
 

 Dr. Mangieri admitted that he could not name a single medical professional who would agree with his theory that exposure to workplace chemicals can aggravate po-lymyositis.
 

 We agree with Arvin that the record does not contain substantial evidence that Handley’s polymyositis is an occupational disease. Dr. Mangieri’s testimony established that the medical community has not identified any causal link between chemical exposure and the contraction of polymyositis.
 
 [7]
 
 In the absence of such a link, Handley could not establish that the presence of airborne chemicals in the Ar-vin workplace exposed him to a peculiar or increased risk of contracting polymyositis. Dr. Mangieri’s testimony further established that the cause of polymyositis was completely unknown to the medical community, which renders any theory that chemical exposure could lead, directly or indirectly, to the disease completely speculative. A finding of fact cannot be based on speculation, surmise or conjecture.
 
 See Ex parte Southern Energy Homes, Inc.,
 
 873 So.2d 1116 (Ala.2003). Consequently, we hold that the trial court erred in finding that Handley’s employment conditions aggravated his polymyositis.
 
 [8]
 

 Handley argues that any error the trial court may have committed in finding that exposure to substances in his employment aggravated Handley’s polymyositis is harmless.
 
 See
 
 Rule 45, Ala. R.App. P. Handley contends that Handley is permanently and totally disabled from his bronchitis and COPD alone. However, in its judgment, the trial court did not differentiate between the diseases as to their effect on Handley’s disability. Rather, the trial court concluded that “[Handley] is totally and permanently disabled as a result of occupational diseases ...,” indicating that
 
 *686
 
 it considered all three conditions contributed to the disability.
 
 See Advantage Sales of Alabama, Inc. v. Clemons,
 
 979 So.2d 114, 120-121 (Ala.Civ.App.2007). Moreover, as will be more thoroughly explained in the following section, the trial court erred in considering Handley’s COPD claim. Therefore, the case must be reversed and the cause remanded for the trial court to consider Handley’s disability without reference to his polymyositis.
 
 See United Defense, L.P. v. Willingham,
 
 829 So.2d 771 (Ala.Civ.App.2002) (remanding case to trial court to issue findings as to disability based solely on conditions legally and medically caused by employment).
 

 COPD
 

 Arvin next argues that the trial court erred in allowing Handley to proceed with a claim for COPD, in finding that Handley had COPD, and in finding that Handley’s COPD was an occupational disease. Because we find the first argument dispositive, we do not consider the last two issues.
 

 Arvin complains that Handley had not revealed that he was claiming COPD before the trial. The complaint indicates generally that Handley contracted an unnamed occupational disease due to exposure to chemicals in the workplace. On March 21, 2006, Handley filed a motion to expedite the trial of this case, indicating the only disease he had contracted was polymyositis. In his supplemental responses to interrogatories dated April 24, 2006, Handley indicated that the only disease for which he had been diagnosed was polymyositis; he mentioned that he was being treated for complications from poly-myositis, but he did not mention COPD. In his pretrial deposition, Dr. Mangieri testified at length regarding polymyositis, but did not testify at all about COPD. At the trial, which commenced on June 29, 2006, however, Handley presented evidence that in addition to polymyositis, he had contracted COPD from his workplace environment.
 
 [9]
 
 Arvin objected to the introduction of that evidence on the ground that it had not been notified before trial that Handley had COPD or that Handley was claiming his COPD was compensable. The trial court overruled the objection.
 

 On appeal, Arvin argues that it has been unfairly prejudiced by the late revelation of the COPD claim because, it says, it had prepared its defense based solely on the polymyositis claim. Handley counters that Arvin was only surprised by the COPD claim because it did not thoroughly conduct discovery as to the identity of the diseases Handley was claiming to be occupational. Handley maintains further that Arvin should have deduced that Handley was claiming to have contracted COPD from occupational exposure from the medical records Handley produced to Arvin. Handley essentially contends that he provided sufficient notice to Arvin through his complaint and his medical records that he was claiming his COPD was an occupational disease.
 

 The record refutes Handley’s contentions. The record shows that once discovery commenced on Handley’s individual claims, Arvin made a consistent effort to fully ascertain the nature of the occupational disease that Handley claimed in his complaint. In response to direct questions as to the diseases for which he had been
 
 *687
 
 diagnosed and treated, Handley identified only polymyositis and further identified only physicians who were treating him for polymyositis and complications from that condition.
 
 [10]
 
 Handley further did not disclose that Dr. Mangieri had treated him and that Dr. Mangieri had diagnosed him with COPD. In Dr. Mangieri’s deposition, the following exchange took place:
 

 “[ARVIN’S COUNSEL]: Okay. Is there any test performed on Mr. Hand-ley or any other of your patients that shows a by-product or artifact of any of the toxins that you contend they were exposed to in the plant?
 

 “[DR. MANGIERI]: We haven’t looked — I haven’t looked for specific substances. We have looked at the injuries that these people have suffered as a consequence of the exposures.
 

 “[ARVIN’S COUNSEL]:
 
 What other health problems did Mr. Handley have?
 

 “[DR. MANGIERI]:
 
 He had sleep apnea and obesity.”
 

 Dr. Mangieri did not testify that he had diagnosed Handley with COPD. The doctor did testify in his deposition that he had seen at least 10 persons as patients who had worked at the Arvin plant and who he believed had restrictive airways disease. He did not identify Handley as one of those patients.
 

 Additionally, the approximately 10 boxes of medical records Handley produced to Arvin did not disclose any diagnosis of COPD. Dr. Mangieri testified at trial that, based on his review of the medical records, Handley had been suffering from symptoms consistent with COPD since before his layoff from Arvin and that the multitude of doctors who treated Handley had simply failed to diagnose COPD or had overlooked the condition. Although a medical expert retained by Arvin may have been able to sift through the mountain of medical records to ferret out the undiagnosed COPD,
 
 [11]
 
 the rules of discovery did not require such an extraordinary effort. Once Dr. Mangieri determined that he would testify that Handley suffered COPD related to his occupational exposure, Handley was under a duty to notify Arvin of that expected testimony.
 
 See
 
 Rule 26(e)(1) and (2), Ala. R. Civ. P. (requiring party to supplement discovery responses to reflect substance of expert witness’s expected trial testimony). Hand-ley utterly failed to apprise Arvin that COPD was the unnamed occupational disease alleged in his complaint.
 

 A party may not conceal the specific nature of a claim in the discovery process. In
 
 Ex parte McFadden Engineering, Inc.,
 
 835 So.2d 996, 1004 (Ala.2002), the court considered a petition for writ of mandamus in a discovery dispute. After deposing the plaintiffs, the petitioner requested to inspect their homes to, among other things, verify the damages to which the plaintiffs had testified in their depositions. The trial court denied the inspections except for appraisal purpose. 835 So.2d at 998-1002. In defending the denial, the plaintiffs argued that the petitioner should have anticipated the specific damages the plaintiffs were claiming and inspected their homes prior to their deposi
 
 *688
 
 tions. 835 So.2d at 1004. In rejecting this argument, the court stated:
 

 “However, this argument ignores both the nature of the adversarial process and the realities of the discovery process. In our judicial system, the burden of proof is always on the party bringing the allegations. In a civil case, because the plaintiff brings the allegations and therefore carries the burden of proof, the defendant need not ‘guess’ or ‘speculate’ as to what evidence of damage the defendant should seek to counter. Instead, the defendant’s course of discovery ‘follows’ the plaintiffs evidence of damage, which is identified through the discovery process.
 

 “Obviously, to say that the petitioners were aware of general ‘problems’ is not to say that they were aware of the specific damage the petitioners would be charged with having caused. Given the fact that pleadings are generally stated in very broad terms, see Ala. R. Civ. P. 8(a) (requiring only ‘a short and plain statement of the claim showing that the pleader is entitled to relief), the very purpose of discovery (especially the taking of depositions) is to give the parties an opportunity to clearly define the damage being asserted, which provides the party being charged with wrongdoing fair notice of the specific ‘wrongs’ he must then be prepared to counter at or before trial:
 

 “ ‘ “Generally speaking, the purpose of modern discovery is to assist the administration of justice, to aid a party in preparing and presenting his case or his defense, to advance the function of a trial in ascertaining truth, and to accelerate the disposition of suits. Beyond this, the rules for discovery are designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments be rested upon the real merits of cases and not upon the skill and maneuvering of counsel.” 23 Am. Jur.2d, Depositions and Discovery, § 155 (1965). Stated otherwise, the rules seek to “make a trial less a game of blind man’s buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.”
 
 United States v. Procter and Gamble Co.,
 
 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958);
 
 Hickman v. Taylor,
 
 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).’
 

 “Ex parte Dorsey Trailers, Inc.,
 
 397 So.2d 98, 103 (Ala.1981) (also stating that ‘[a] defendant is entitled to the factual basis of the plaintiffs claim and all facts going to prove or disprove defendant’s defense,’ 397 So.2d at 104); see also
 
 Cone Builders, Inc. v. Kulesus,
 
 585 So.2d 1284, 1289 (Ala.1991) (stating that ‘[ujndeniably, the purpose of the discovery process is to avoid unfair surprise at the trial’).”
 

 835 So.2d at 1004. The court therefore granted the petition for a writ of mandamus and directed the trial court to allow the petitioners to inspect the plaintiffs’ homes without the limitation set out in its order. 835 So.2d at 1006.
 

 Based on the principles espoused in
 
 McFadden,
 
 it is apparent that Arvin did not act unreasonably in failing
 
 to
 
 question Dr. Mangieri about COPD because it was merely “following” the lead Handley’s discovery responses had established. By identifying only polymyositis as the occupational disease at issue, and by failing to identify COPD, Handley plainly did not “clearly define the damage being asserted” and thereby prevented Arvin from being able to prepare itself to “counter” that claim. As a result, Handley enjoyed the advantage of being able to present his COPD claim against a surprised and un
 
 *689
 
 prepared opponent at trial, which enabled him to procure a judgment resting not on “the real merits of the case,” but on “the skill and maneuvering of his counsel.”
 

 In at least two recent cases, this court has ruled that an employee who fails to fairly notify the employer before trial that he or she is claiming a specific injury may not introduce evidence regarding that injury at trial over the employer’s objection.
 
 See Kohler Co. v. Miller,
 
 921 So.2d 436 (Ala.Civ.App.2005), and
 
 Advantage Sales of Alabama, Inc. v. Clemons, supra.
 
 Those cases rely on Rule 15, Ala. R. Civ. P., which prevents a party from amending a complaint at trial to add a claim when that claim has not been tried by the express or implied consent of the opposing party.
 
 See also Ex parte Fort James Operating Co.,
 
 905 So.2d 836 (Aa.Civ.App.2004) (holding that trial court erred in allowing employee to amend complaint one week before trial to assert new claim for shoulder injury and to reassert previously withdrawn claim for back injury). In both cases, the court reasoned that an employer who has not been properly and timely notified that the employee is claiming an injury other than the injuries claimed in the complaint would be unfairly prejudiced by evidence relating to the newly asserted claim if the trial court awarded benefits based on that previously unnamed injury. In
 
 Kohler,
 
 the trial court did not award benefits for the undisclosed injury, so its error in admitting evidence regarding the new claim was considered harmless error. 921 So.2d at 443. In
 
 Clemons,
 
 however, the trial court committed reversible error by awarding permanent-total-disability benefits based on part on a psychological injury that had not been disclosed prior to trial. 979 So.2d at 120-21.
 

 In this case, despite direct questioning, Handley did not, prior to trial, specifically identify COPD as the occupational disease he claimed he had contracted from his workplace exposure. Therefore, the trial court erred in allowing Handley to present evidence that he had contracted COPD from his occupational exposure over Arvin’s objection. As we found in
 
 Clemons,
 
 that error was not harmless because the trial court awarded Handley permanent-total-disability benefits based in part on its finding that Hand-ley’s COPD was an occupational disease arising out of and in the course of Hand-ley’s employment at Arvin. Therefore, the judgment of the trial court is reversed and the case is remanded with instructions for the trial court to reconsider its judgment without regard for Handley’s COPD claim.
 

 Maximum Medical Improvement
 

 Arvin next maintains that Handley failed to prove that he reached maximum medical improvement. Based on our prior rulings, the only remaining claim for which Handley may receive benefits is his claim for the contraction of chronic bronchitis. In order to recover permanent-disability benefits for that disease, Handley must have proven that he had reached maximum medical improvement.
 
 Ex parte Phenix Rental Ctr.,
 
 873 So.2d 226, 232 (Aa.2003). As the court explained in
 
 Ex parte Phenix Rental Center:
 

 “A claimant has reached [maximum medical improvement] MMI when ‘there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant’s disability.’
 
 G.UB.MK. Constructors v. Traffanstedt,
 
 726 So.2d 704, 709 (Aa.Civ.App.1998). ‘[M]aximum medical improvement is reached when the employee has recovered as much as medically possible from the wound such that the extent of permanent disability, if any, can be estimated.’ 1 Terry A. Moore,
 
 Alabama’s
 
 
 *690
 

 Workers’ Compensation
 
 § 13:5, p. 502 (1998)(footnotes omitted). ‘Maximum medical improvement does not mean complete cure or total recovery from the work-related injury.’
 
 Id.
 
 ‘Permanent disability refers to the compensable disability remaining after the employee has reached maximum medical improvement.’
 
 Id.
 
 at § 13:15, p. 514 (emphasis added; footnote omitted).”
 

 873 So.2d at 229.
 

 In its judgment, the trial court awarded Handley permanent and total disability benefits commencing on December 14, 2001.
 
 [12]
 
 That finding implies that the trial court concluded that Handley reached maximum medical improvement on December 14, 2001.
 
 See Halsey v. Dillard’s, Inc.,
 
 897 So.2d 1142, 1148 (Ala.Civ.App.2004) (“It is well settled that in order for an employee to recover permanent partial or permanent total disability benefits the employee must have reached MML”). We review that finding of fact to determine if it is supported by substantial evidence.
 
 See Ex parte Trinity Industries, supra.
 

 The record evidence shows that Handley ceased actively working at the Arvin plant on May 18, 2001, but that he was officially laid off on December 14, 2001. Handley has not worked since that date. No evidence established that Handley had reached maximum medical improvement for his bronchitis condition at that time. Dr. Mangieri testified that by the time of trial it was apparent that Handley, who had been in the hospital for the prior 10 months, was not expected to improve. Dr. Mangieri indicated that Handley had suffered a complete respiratory failure in 2005 and had since been chronically debilitated. That testimony may establish that Handley reached a plateau in his medical treatment for all of his conditions, including his chronic bronchitis, at some point in 2005 and that subsequent treatment had been directed at palliative care. However, that determination must be made by the trial court as it is the trial court’s duty to make findings of fact based on the evidence contained in the record of the hearing.
 
 See
 
 Ala.Code 1975, § 25-5-88. We conclude only that substantial evidence does not support the trial court’s finding that Handley reached maximum medical improvement for his chronic bronchitis on December 14, 2001.
 

 Benefits
 

 Arvin next contends that the trial court erred in awarding Handley medical and disability benefits. Arvin argues that the trial court erred in awarding Handley medical benefits because, it says, Arvin did not authorize any of Handley’s medical treatment, Handley did not prove the amount of medical expenses, and Hand-ley’s medical expenses were covered by Handley’s private insurance. As for disability benefits, Arvin argues that the trial court erred in awarding permanent-total-disability benefits that overlapped the same time period Handley was receiving benefits for his cervical-spine injuries pursuant to his settlement. Arvin further argues that the trial court erred in failing to setoff short-term disability and disability-retirement benefits Handley received.
 

 In its argument relating to the medical bills, Arvin contends only that it should not have to pay for the treatment Handley received for his polymyositis and COPD.
 
 *691
 
 As we have already determined that Hand-ley failed to prove his polymyositis was an occupational disease and that the trial court erred in allowing Handley to claim his COPD was a compensable occupational disease, Handley is not entitled to any medical benefits for the treatment of those conditions.
 
 See generally Ex parte Publix Super Markets, Inc.,
 
 963 So.2d 654 (Ala.Civ.App.2007) (discussing prerequisites for the recovery of medical expenses). Therefore, we need not address Arvin’s argument regarding the medical expenses.
 

 Because we are remanding the case for reconsideration of the disability award, we will address Arvin’s arguments relating to disability benefits. The evidence indicates that Arvin paid Handley a lump sum of $60,000 in workers’ compensation benefits on account of his cervical-spine injuries. The October 17, 2002, judgment approving that settlement indicates that $8,000 of that amount was allocated to a May 9, 1999, injury date and $52,000 was allocated to a May 18, 2001, injury date. None of these payments were designated for past or future medical expenses. In addition, Arvin paid Handley $230 per week in short-term disability benefits from May 19, 2001, to November 17, 2001, for a total of $6,596.54. Finally, Arvin also asserts in its brief that it has paid Handley monthly disability-retirement benefits since May 2002.
 

 Because Arvin is claiming that its liability to Handley for any occupational disease should be reduced to the extent of the above payments, Arvin bore the burden of proving its right to the credits and offsets.
 
 See Ex parte Fort James Operating Co.,
 
 895 So.2d 294 (Ala.2004). Generally speaking, an employee may not recover more than the amount of permanent-total-disability benefits for the same time period.
 
 See
 
 Ala.Code 1975, § 25-5-57(a)(4)f.;
 
 see also Wal-Mart Stores, Inc. v. Bratton,
 
 678 So.2d 1071 (Ala.Civ.App.1995) rev’d on other grounds
 
 Ex parte Bratton,
 
 678 So.2d 1079 (Ala.1996). Although Arvin argues that the 2002 settlement amounts covered part of the same time period covered by the 2006 judgment awarding permanent-total-disability benefits, Arvin failed to prove it. Arvin did not offer any evidence as to the time period intended to be covered by the 2002 settlement or how the settlement amount was calculated. In the absence of such evidence, the trial court did not have before it any means for determining the credit to which Arvin would be entitled on account of the settlement payments.
 

 Arvin’s right to a credit for short-term disability benefits and disability-retirement benefits is governed by Ala.Code 1975, § 25 — 5—57(c)(1), which provides:
 

 “In calculating the amount of workers’ compensation due:
 

 “(1) The employer may reduce or accept an assignment from an employee of the amount of benefits paid pursuant to a disability plan, retirement plan, or other plan providing for sick pay by the amount of compensation paid, if and only if the employer provided the benefits or paid for the plan or plans providing the benefits deducted.”
 

 As our supreme court has held, the purpose of § 25-5-57(c)(l) is “to prevent ‘double recovery,’ such as payments from a disability plan or sick plan that a worker might receive as a result of an injury in addition to workers’ compensation benefits.”
 
 Ex parte Taylor,
 
 728 So.2d 635, 637 (Ala.1998).
 

 By its plain language, § 25-5-57(c)(1) only allows employers to credit payments of short-term disability benefits against “the amount of compensation paid.” In this case, Arvin was not ordered to pay any compensation for the period of disability for which Handley received
 
 *692
 
 short-term disability benefits — May 2001 through November 2001. Therefore, Handley did not receive the double recovery the statute was designed to prevent. The trial court did not err in failing to credit the payments of short-term disability benefits against Arvin’s workers’ compensation liability.
 

 For a different reason, we find the trial court did not err in failing to credit disability-retirement benefits. Although Arvin presented evidence that it had entered into a collective bargaining agreement that required it to fund a disability-retirement benefit for its employees, see
 
 Ex parte Dunlop Tire Corp.,
 
 706 So.2d 729 (Ala.1997), and that Handley had applied for and received disability-retirement benefits, Arvin failed to present any evidence as to the amount of the monthly benefit or the date such benefits commenced. Arvin therefore failed to carry its burden of proving the amount of its credit.
 

 Costs
 

 Arvin next argues that the trial court abused its discretion in taxing costs in the amount of $83,312.16 because, according to Arvin, that award is excessive.
 
 [13]
 

 “The taxation of costs in workers’ compensation cases is within the discretion of the trial court, and its judgment will not be reversed on appeal absent a showing of an abuse of that discretion. § 26-5-89, Ala.Code 1975;
 
 Ex parte Ellenburg,
 
 627 So.2d 398 (Ala.1993). This includes costs of expert witnesses.
 
 Star Rails, Inc. v. May,
 
 709 So.2d 44, 46 (Ala.Civ.App.1997).”
 

 Tallassee Super Foods v. Hepburn,
 
 819 So.2d 63 (Ala.Civ.App.2001). Arvin contends that the award includes “double counting of Mangieri’s time, totally unnecessary charges occasioned by plaintiffs failure to follow the statutory procedure for certifying medical records, and assigning to this case ‘expert’ fees paid to Lori Andrews for work on other cases.” The only case or other legal source cited by Arvin in support of its argument that the costs taxed were excessive is
 
 Bundrick v. McAllister,
 
 882 So.2d 864 (Ala.Civ.App.2003).
 
 Bundrick,
 
 however, was not a workers’ compensation case and, therefore, is not instructive with regard to the fees paid to expert witnesses or the need for the same in the present case.
 

 With regard to Arvin’s contention that the award includes duplicative charges for Mangieri’s testimony, the trial court determined that those were “separate charges for expert witness fees and for review of certified records.” In its order reducing the amount of taxed costs, the trial court indicated that it had reduced the costs in response to Arvin’s arguments directed toward the certification of the medical records and the number of copies thereof. The trial court also reduced the amount of costs related to Andrews’s expert fees. Based on Handley’s documentation of costs, the trial court’s reduction of costs in response to each of the arguments asserted by Arvin on appeal, the limited arguments advanced by Arvin in its principal brief, and the appropriate standard of review, we conclude that the trial court’s award of taxed costs was not an abuse of discretion.
 

 
 *693
 

 Rule 60(b)(2) Motion
 

 Arvin last contends that the trial court erred in denying its motion for relief from the judgment under Rule 60(b)(2), Ala. R. Civ. P. Arvin filed its motion on November 6, 2006. At that time, the case was on appeal to this court pursuant to the notice of appeal filed by Arvin on August 17, 2006. Rule 60(b) states that leave to make a motion for relief from a judgment under that rule must be obtained from the appellate court when an appeal from the judgment is pending before that court. Arvin did not seek leave to file its Rule 60(b) motion with this court; therefore, the trial court never obtained jurisdiction to rule on the motion.
 
 See Personnel Bd. for Mobile County v. Bronstein,
 
 354 So.2d 8 n. 3 (Ala.Civ.App.1977). Because the Rule 60(b) motion was not properly before the trial court, it did not err in denying it.
 

 Conclusion
 

 Based on the foregoing, we conclude that the trial court erred in awarding Handley benefits for polymyositis and COPD, but that the trial court did not err in awarding Handley benefits for chronic bronchitis. On remand, the trial court is to determine the date Handley reached maximum medical improvement for that occupational disease; to decide the extent of any permanent disability resulting solely from that occupational disease; to ascertain the reasonable amount of medical benefits attributable to the reasonably necessary treatment of that disease; and to award benefits accordingly. The compensation awarded shall not be affected by the compensation Handley received in the 2002 lump-sum settlement or by the payments Handley received for short-term disability or disability retirement. The medical benefits awarded shall not be reduced by any amount paid by Handley’s insurer.
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 [1]
 

 . Arvin filed a petition for a writ of mandamus based on the denial of this summary-judgment motion. This court denied the petition on June 13, 2006. See
 
 Ex parte Arvin-Meritor, Inc.
 
 (No. 2050723, June 13, 2006) 987 So.2d 667 (Ala.Civ.App.2006) (table). The trial court apparently continued the case from the June 8, 2006, setting until this court ruled on the petition.
 

 [2]
 

 . Handley argues that Arvin waived its right to rely on the settlement by failing to plead release as an affirmative defense.
 
 See
 
 Rule 8(c), Ala. R. Civ. P. We reject that argument To sustain its res judicata defense, Arvin relies solely on the terms of the judgment approving the settlement and not the terms of the settlement itself.
 
 See J & R Carrozza Plumbing Co. v. Industrial Comm’n of Illinois,
 
 307 Ill.App.3d 220, 223, 240 Ill.Dec. 345, 717 N.E.2d 438, 440 (1999) (noting that res judicata is closely related, but separate from defense of
 
 *679
 
 release). By pleading res judicata as an affirmative defense, Arvin amply notified Handley of its position that the October 17, 2002, judgment barred the claims asserted in the November 2003 complaint.
 

 [3]
 

 . Neither Arvin nor Handley discuss the effect of the
 
 Williams
 
 case on the issue at hand. Hence, we have not been asked to overrule
 
 Williams.
 

 [4]
 

 . Because the language of the settlement agreement supports the trial court’s finding that the October 17, 2002, judgment did not resolve Handley's occupational-disease claim, we need not consider Arvin's argument that the trial court erred in considering parol evidence regarding the negotiation of the September 29, 2002, settlement, the discussions between Arvin's and Handley’s attorneys leading up to and at the time of the settlement approval hearing, and the authority of Hand-ley's attorney to agree to the release of claims other than Handley's claims based on his cervical-spine injuries. Any error committed by the trial court in considering that evidence would have been harmless error.
 
 See
 
 Rule 45, Ala. R.App. P.
 

 [5]
 

 . These checks were payable for short-term disability benefits and profit-sharing.
 

 [6]
 

 . Handley also presented evidence that he attended a Thanksgiving meal in November 2001; however, no witness testified as to the conditions in the plant during that meal and no witness testified that Handley was exposed to any hazardous substances during the meal. Therefore, we will not address that visit further.
 

 [7]
 

 . Based on Dr. Mangieri's testimony, any testimony given by Andrews that Handley was exposed to an increased and peculiar risk of inhaling hazardous chemicals at work does not prove that Handley’s employment exposed him to an increased and peculiar risk of contracting polymyositis.
 

 [8]
 

 . Because we conclude that Handley failed to prove his polymyositis was an occupational disease, we pretermit any discussion of Hand-ley's argument that the trial court erred in admitting the testimony of Dr. Mangieri regarding the relationship between Handley’s employment and his contraction of polymyositis.
 

 [9]
 

 . Handley also introduced evidence that he had contracted chronic bronchitis from his workplace exposure. Arvin does not argue in its principal brief that Handley should have been precluded from introducing evidence of that claim, but raises that argument for the first time in its reply brief. Therefore, we consider that issue waived.
 
 See Walden v. Hutchinson,
 
 987 So.2d 1109 (Ala.Civ.App.2007).
 

 [10]
 

 . Handley did not attempt to prove that his COPD was a complication of his polymyositis, but did attempt to prove that his polymyositis was aggravated by his COPD.
 

 [11]
 

 . We note that even if Arvin’s medical expert had been able to identify Handley's alleged undiagnosed COPD, that expert would not have been able to determine whether Handley was claiming he contracted COPD from his occupational exposures. The medical records revealed that Handley suffered from other medical conditions, including diabetes and hypertension, which Handley did not claim as occupational diseases.
 

 [12]
 

 . The trial court did not award Handley any temporary-disability benefits. Handley did not file a cross-appeal on this issue so we do not consider whether that failure is erroneous.
 
 See State Health Planning & Development Agency v. AMI Brookwood Med. Ctr., a Div. of Brookwood Health Servs., Inc.,
 
 564 So.2d 54, 59 (Ala.Civ.App.1989), rev'd on other grounds
 
 Ex parte Shelby Med. Ctr., Inc.,
 
 564 So.2d 63 (Ala.1990).
 

 [13]
 

 . We note that Arvin filed its notice of appeal on August 17, 2006. The trial court subsequently amended its award of costs on September 28, 2006. The trial court had jurisdiction to modify its cost award despite the pendency of the appeal and we may review its final judgment relating to costs.
 
 See Hinson v. Holt,
 
 776 So.2d 804, 813 (Ala.Civ.App.1998).